**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ELIZABETH MCMILLAN-MCCARTNEY, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:18-cv-03331-CBD |
| | ) | |
| CALDWELL MCMILLAN, JR., | ) | |
| *Defendant.* | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES    iii

INDEX OF EXHIBITS    v

INTRODUCTION    1

PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE    2

PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED FACTS    5

STANDARD OF REVIEW    15

ARGUMENT    17

  I.    COUNT IV – CONTRIBUTION    16

  II.    COUNT V – EQUITABLE LIEN    16

  III.    COUNT VI – WASTE    18

  IV.    COUNT VIII – BREACH OF ORAL CONTRACT    22

      A.  COUNT VIII IS NOT BARRED BY COLLATERAL ESTOPPEL  23

      B.  COUNT VIII IS NOT BARRED BY THE STATUTE OF FRAUDS    27

  V.    COUNT IX – UNJUST ENRICHMENT    30

  VI.    COUNT X – QUANTUM MERUIT    31

  VII.    COUNT XI – OUSTER    32

  VIII.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER CLAIM FOR SALE LIEU OF PARTITION    33

  CONCLUSION    35

# **TABLE OF AUTHORITIES**

## **Statutes**

MD. CODE ANN. EST. & TRUSTS 2-102(a) .......................................................................... 30
MD. CODE ANN. EST. & TRUSTS ART. §8-109 ................................................................. 31
MD. REAL PROP. CODE ANN. 14-107(a) ......................................................................... 39

## **Cases**

*In re Estate of Parikh*, Nos. 1480, 1655, 501, 2312, 302, 2020 Md. App. LEXIS 295 (Md. Ct.
    App. 2020)................................................................................................................ 30
*Adickes v. S.H. Kress & Co.*, 398 U.S. 157 (1986) ........................................................ 20
*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153 (3d Cir. 1999) ............................... 21
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................. 20, 39
*Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 559 A.2d 365 (1989) ..................... 22
*Bellows v. Sowles*, 57 Vt. 164 (1884) ............................................................................. 32
*Boyd v. Boyd*, 32 Md. App. 411, 419, 361 A.2d 146, 151 (1976)........................... 39, 40
*Brown v. Quinton*, 86 Kan. 658, 122 P. 116 (1912)....................................................... 32
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................... 20, 38
*Clarks v. Private Money Goldmine*, No. GJH-19-1014, 2020 U.S. Dist. LEXIS 33191 (D. Md.
    2020).................................................................................................................. 26, 34
*Coutant v. Coutant*, 86 Md. App. 581, 587 A.2d 1125 (1991) ...................................... 24
*Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 250 A.2d 69 (1969)........................... 26
*Fishman v. Murphy*, 433 Md. 534, 554, 72 A.3d 185 (2013) ........................................ 23
*Fowler v. Brady*, 110 Md. 204, 73 A. 15 (1909)........................................................... 30
*Hecht v. Resolution Tr. Corp.*, 333 Md. 324, 635 A.2d 394 (1994) .............................. 26
*Hill v. Cross Country Settlements, LLC*, 402 Md. 281 (2007) ....................................... 22
*Hogan v. McMahon*, 115 Md. 195, 80 A. 695 (1911)............................................... 22, 23
*In re Estate of Reed*, No. E2015-02372-COA-R3-CV, 2016 Tenn. App. LEXIS 604 (Ct. App.
    Aug. 22, 2016)..................................................................................................... 33
*JFY Props. II LLC v. Gunther Land, LLC*, Civil Action No. ELH-17-1653, 2019 U.S. Dist.
    LEXIS 170199 (D. Md. 2019) .............................................................................. 20
*Johnson v. Hoover*, 75 Md. 486, 23 A. 903 (1892)....................................................... 39
*Mace v. Domash*, No. 05-02244 (HHK), 2008 U.S. Dist. LEXIS 142407 (D.D.C. Dec. 1, 2008) 34
*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...... 39
*Meyers v. E. End Loan & Sav. Ass'n*, 139 Md. 607, 116 A. 453 (1922)........................ 23
*Pence v. Norwest Bank Minn., N.A.*, 363 Md. 267, 768 A.2d 639 (2001) .................... 23
*Pino v. Clay*, 251 Md. 454, 248 A.2d 101 (1968) ......................................................... 23
*Pratt v. Humphrey*, 22 Conn. 317 (1853)...................................................................... 32
*Rinn v. First Union Nat'l Bank of Md.*, 176 B.R. 401 (D.Md. 1995) ............................. 22
*See Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt.*, 988 F. Supp. 2d 542 (D. Md. 2013)............. 35
*Stout v. Reuschling*, Civil Action No. TDC-14-1555, 2015 U.S. Dist. LEXIS 39997 (D. Md. 2015)
    .......................................................................................................................... 20, 31
*Thruston v. Minke*, 32 Md. 571 (1870)........................................................................... 40
*United States ex rel. Asphalt Contractors v. Kar Contracting, Ltd. Liab.* Co., No. 3:14-27451,
    2015 U.S. Dist. LEXIS 75512 (S.D. W. Va. 2015)................................................ 36

*Murphy v. Merzbacher*, 346 Md. 525, 697 A.2d 861 (1997) .......................................................... 25

*Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981) ........................................................ 26

*White v. Pines Cmty. Improvement Ass'n*, 403 Md. 13, 939 A.2d 165 (2008) .............................. 37

*Yingling v. Phillips*, 65 Md. App. 451, 501 A.2d 87 (1985) ........................................................ 34

**Rules**

Federal Rule of Civil Procedure 56.................................................................................................... 25

Md. Rule 12-401 ............................................................................................................................... 39

## INDEX OF EXHIBITS

Exhibit A                           Declaration of Elizabeth McMillan-McCartney

Exhibit B                           May 23, 1990 Contract

Exhibit C                           July 23, 1993 Contract

Exhibit D                           Transcript of Orphans' Court Hearing Oct. 31, 2017
                                    (Excerpt)

Exhibit E                           Sept. 20, 1990 Estate Appraisal – C. McMillan Sr. Estate

Exhibit F1-F3                       2020 Appraisals

Exhibit G1-G3                       2021 Appraisals

**INTRODUCTION**

The instant dispute, between Plaintiff and the Defendant, her brother, arises largely out of Defendant's breach of two oral agreements and one written agreement in 2017 and 2018. The three contracts were formed more than 23 years before the breach when the Parties were in the midst of starting to settle their parents' probate estates. As part of that process, the Parties assumed control of their parents' company – Sylmac Inc. – with the goal of completing a highly ambitious project started by their parents, developing a residential subdivision called Twin Hills. The Parties envisioned that the profits from the development would pass to the parent's estates and, after payment of expenses, would eventually be distributed to them as inheritance. In connection with this endeavor, the Defendant promised, in 1989, to personally repay Plaintiff half of any expenses they incurred and in 1991, he agreed to pay her $40.00 per hour for work she did. Defendant promised to repay these amounts when the estates closed and final distributions made. In 1993, Defendant mortgaged the family homestead owned by the Parties as co-tenants, and a third agreement (in writing) was made whereby Defendant agreed to repay Plaintiff for any money she loaned him towards the mortgage, also when the estates were closed and he received his inheritance. The subdivision process dragged on until 2017, when the final lot was sold. During this period, Plaintiff paid nearly every single expense related to her father's estate and the Twin Hills subdivision, she depleted her savings, mortgaged her family home, borrowed money, all with the expectation that Defendant would honor their agreements and repay her when the estates were closed. Defendant paid nothing towards the expenses and essentially exploited Plaintiff. He traveled abroad, pursued various business ventures, and continued to live in the family homestead on Plaintiff's dime all the while letting the property fall into a shocking state of disrepair, which he hid from Plaintff.

When, in 2017, it finally looked like the estates could be closed and Plaintiff would be repaid, Defendant repudiated the oral contracts and refused to close his father's estate and pay Plaintiff anything in breach of the 3 agreements. Shortly thereafter, Plaintiff filed this lawsuit seeking a partition sale of the family homestead, and an adjustment of the equities to try and recover the more than $411,000.00 of co-tenant, and other expenses she paid on Defendant's behalf, including his entire mortgage. Defendant now seeks summary judgment on multiple counts in the Complaint, but as is shown below, his arguments come up short because most if not all of the issues involve factual disputes that will require the trier of fact to weigh evidence and make credibility determinations. Defendant also attempts to again conflate the Orphans' Court proceeding wherein Plaintiff sought to recoup administrative expenses from her father's estate with the claims against him individually in this case. The Court should summarily dismiss Defendant's arguments and instead grant Plaintiff summary judgment on Count I of the complaint – Sale in Lieu of Partition. Defendant did not move on this Count and will not be able to establish a dispute of fact as to whether the family's homestead (1886 Crownsville Road, Annapolis, Maryland 21401) is subject to partition in kind. Thus, a sale is inevitable and there is no triable issue as to this claim.

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

1.      Plaintiff agrees that the Parties are siblings whose parents died on separate dates in 1989.

2.      Plaintiff agrees that this dispute involves, *inter alia*, inherited real property in Annapolis, Maryland.

---

[1] In the Statement of Material Facts in Dispute, Plaintiff responds to each of Defendant's facts.

3.     Plaintiff disputes that various lots were developed and sold by the respective probate estates of their parents. The corporation formed by the Parties' parents – Sylmac, Inc. –developed, marketed and sold the individual lots. *See* Decl. of Elizabeth McMillan-McCartney ¶¶ 3, 6, Ex. A.

4.     Plaintiff agrees that the final lot was sold in 2017.

5.     Plaintiff agrees that the Homestead lot (hereinafter "Homestead Lot") has not been sold. Instead, the parties, as executors of their parents' respective estates, transferred to themselves, individually a one-half interest in the Homestead Lot as tenants in common. That is how the Homestead Lot is presently titled. *See* Ex. A ¶ 5.

6.     Plaintiff agrees that Defendant has resided in the Homestead Lot since their parents passed away.

7.     Plaintiff agrees that her claims against Defendant include a request for reimbursement for time she spent and expenses she incurred assisting Defendant in his capacity as the executor of their late father's estate and also to recover money she loaned Defendant so he could pay off a mortgage he obtained which was secured by the Homestead Lot.

8.     Plaintiff agrees that she filed a claim for reimbursement in her father's estate in the amount of $61,800.17, including reimbursement for work performed, travel time and expenses she incurred. Plaintiff further agrees that she is seeking to recover for these same services/travel time and expenses against Defendant individually in this case.

9.     Plaintiff disputes that the Orphans' Court (for Anne Arundel County, Maryland) held that Plaintiff was not entitled to seek recovery from Defendant individually. The Orphans' Court only ruled on her claim for expenses from her father's estate. Ex. A ¶ 23.

10.    Plaintiff agrees that Count IV of her complaint is for contribution from Defendant for money she loaned him to pay a mortgage he obtained and secured against against the Homestead

Lot and also for the carrying charges on the Homestead Lot, his share of which she paid, including property taxes and hazard insurance.

11.     Plaintiff disputes that the total amount owed pursuant to the contribution claim is "roughly $400,000.00" the actual amount paid by Plaintiff for the mortgage, property taxes and insurance, through 2021, exceeds $411,000.00. Ex. A ¶ 17.

12.     Plaintiff disputes that Defendant's last payment towards the debt was in 2006. Defendant made payments to Plaintiff towards the accrued debt for his share of home owner's insurance payments and property tax payments in 2016, 2017 and 2018. Ex. A ¶ 17.

13.     Plaintiff is unable to dispute or agree with Defendant's statement that the detached apartment, which is located on the Homestead lot, started as a room built above a tractor shed. Plaintiff has no knowledge as to this fact. Ex. A ¶ 26. The Court should disregard this fact because it is not based on Defendant's personal knowledge but on his "information and belief." ECF No. 82-1 ¶10. This fact is also not material for purposes of summary judgment.

14.     Plaintiff neither disputes nor agrees with Defendant's statement that the detached apartment originally had no plumbing or electricity and was used by a farmhand. Ex. A ¶ 26. This fact is also not material for purposes of summary judgment.

15.     Plaintiff neither disputes nor agrees with Defendant's statement that after a fire in the 1950s, improvements were made to the detached apartment to make it minimally habitable. Ex. A ¶ 26. This is also not a material fact.

16.     Plaintiff agrees with Defendant's statement that improvements were made to the detached apartment around 1970 and that it was thereafter occupied by family members or rented out. This is also not a material fact.

17.     Plaintiff disputes that any improvements were done to the detached apartment illegally, without permitting or code compliance, that it could not legally be used as a residence. Ex. A ¶ 9. This is not a material fact.

18.     Plaintiff disputes that the detached apartment is not being wasted as to any use that the improvements may allow. The structure is in such bad shape, it cannot be used for any purpose and must be torn down. Ex. A ¶ 26.

19.     Plaintiff disputes that the roof leak did not cause permanent damage. Ex. A ¶ 26.

20.     Plaintiff disputes that the roof leak was repaired in 2010 or 2011, at Defendant's expense. Ex. A ¶ 26.

21.     Plaintiff disputes that there has been no act or omission of waste that she could not have discovered more than three years before the filing of the complaint. Defendant restricted Plaintiff's access to the property such that many areas of the main dwelling house were off limits to her. Ex. A ¶¶ 27-31. Moreover, since approximately 2002, Plaintiff has not had access to the separate apartment. *Id*. First, because Defendant rented it out, and then because he removed the stairs, which were the only source of access. *Id*.

## PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED FACTS[2]

### BACKGROUND

1.     On January 16, 1989, the Parties' mother, Sylvia Ross-McMillan, passed away. *See* E. McMillan-McCartney Decl. ¶ 1, Ex. A

2.     On December 3, 1989, the Parties' father, Caldwell McMillan, Sr., passed away. *Id*. ¶ 1.

---

[2] Referenced hereinafter as CSUF.

3.      Both died testate. *Id*. The Parties are the only legatees. *Id*. ¶ 1.

4.      The Parties immediately opened estates for each parent in the Orphans' Court for Anne Arundel County, Maryland. *Id*. ¶ 2. The two estates are styled *In the Matter of the Estate of Caldwell McMillan*, Sr., Estate No. 24,984 and *In the Matter of the Estate of Syliva Ross McMillan*, Estate No. 24, 437, respectively. *Id*. Both estates are still open and have not been fully administered. *Id*.

5.      Before they passed, their parents began to develop and subdivide a 100-acre tract of land they owned. Ex. A ¶ 3. In 1961, they formed a corporation, Sylmac, Inc., to develop, market and sell the individual lots. In the 1980s they began a new subdivision called "Twin Hills". *Id*. Sylmac Inc., borrowed considerable sums of money to fund the Twin Hills project. *Id*.

6.      When Plaintiff's father passed away, there were 31 lots remaining of the original tract, plus the lot containing the McMillan family home, identified as 1886 Crownsville Road, Annapolis, Maryland, and also known as Lot 28R (hereinafter "Homestead Lot"). Ex. A ¶ 4.

7.      On April 25, 1990, the Parties, as executors of their parent's estates, transferred from their parent's estates, to one another individually, a one-half interest in the Homestead Lot. Ex. A ¶ 5. Thereafter, the Parties each owned, and continue to own, a 50% interest in the Homestead Lot as tenants in common. *Id*.

8.      The Parties assumed control of Sylmac, Inc., and operated it with the goal of completing the Twin Hills sub-development project started by their parents. Ex. A ¶ 6. They anticipated that once the construction loan, and other debts were paid off, the proceeds from the sale of the lots would go to the estates and would eventually be distributed to them as an inheritance. *Id*.

## THE 1989 AND 1991 ORAL CONTRACTS

9. Plaintiff was initially named executor of her father's estate through his will upon his passing on December 3, 1989. Ex. A ¶ 7.

10. The week of December 4, 1989, during a meeting between the Parties and Mr. Maffe, an attorney for the estates, the Parties agreed that it made more sense for Defendant, who lived in Maryland, to serve as executor of the father's estate, as opposed to Plaintiff, who lived in Kentucky. The Parties agreed at that meeting, orally, that Plaintiff would renounce her position as executor in favor of Defendant but that Plaintiff would continue to prepare the documents necessary to administer both estates and advance expenses when necessary to cover the cost of administration. *Id*. They further agreed that Defendant would repay Plaintiff personally, for his share of any expenses she paid, when the estates were fully administered and he received his share of their parent's inheritance. *Id*. Shortly after this agreement was struck, on or about December 8, 1989, Plaintiff executed a document renouncing her appointment as executor in favor of Defendant. *Id*. Defendant was appointed as the executor of their father's estate on December 14, 1989.

11. Plaintiff maintained detailed records of all expenses she incurred, including Defendant's individual share, and communicated to Defendant, both in writing and by telephone, not only when she made payments, but also what they were for and the amount of the payment. Ex. A ¶ 8. Plaintiff did so, to make Defendant aware of the precise amount of his share of the estate expenses. *Id*.

12. By early 1991, numerous lawsuits were pending against the estates, Sylmac, Inc, the Parties and the lawyers who had initially represented the estates, in connection with the Twin Hills development project. Ex. A ¶ 9. Sylmac, Inc. filed for Chapter 11 bankruptcy on January 15, 1991 so that the Parties could continue the development project. *Id*.

13.     As a result of the litigation, the Parties had to find new counsel to represent them, the estates, and Sylmac Inc., in those lawsuits. Ex. A ¶ 10. The Parties retained Carl Tenner, Esquire, and during a meeting in his office in late May 1991 agreed, orally, that since Plaintiff had graduated law school and was barred in Kentucky, she would assist Mr. Tenner with research, proof reading and drafting. *Id*. The Parties further agreed that Plaintiff would be entitled to reimbursement for her time at the rate of $40.00 per hour, which was the hourly rate that Mr. Tenner charged for his paralegal staff, plus reimbursement for travel and expenses. *Id*. Defendant agreed he would repay Plaintiff personally, from his share of their parents' inheritance, once final distributions were made to him from the estates. *Id*.

14.     Plaintiff maintained detailed records of all of the work she performed in spreadsheets, including a description of the work, when it was done, and the amount of time spent. Ex. A ¶ 11. Plaintiff's work included preparing documents which had to be filed in the estate of the Parties' father, preparing tax returns for the estate, estate accountings, and other documents and doing legal research and drafting to reduce the litigation costs in the lawsuits the Parties and Sylmac Inc. *Id*.

15.     Defendant was aware of the services rendered by Plaintiff because she sent him her work product, and told him about the specific work she was doing. Ex. A ¶¶ 8, 11. Defendant was also involved in the litigation and had first-hand knowledge of Plaintiff's work. *Id*. Defendant was aware of the expenses Plaintiff was paying for the estates and on his own behalf because he routinely asked her to pay the expenses and would forward her bills and to pay. *Id*. The expenses were also itemized on income tax returns Plaintiff prepared for her father's estate and Sylmac Inc. *Id*. Defendant reviewed and approved these expenses and did not object to them. *Id*.

16.     Defendant benefited from Plaintiff's services because otherwise he would have been

required to hire an attorney to perform the work, at a much higher hourly rate. Ex. A ¶ 12. Instead, he was able to save all of this money and devote his time to personal pursuits like investing in his person business, pursuing new business ventures and traveling. *Id*.

## THE WRITTEN CONTRACT

17.     In early 1990, Defendant asked Plaintiff to let him take out a loan against the Homestead Lot so he could use the money for a personal investment. Ex. A ¶ 13.

18.     Plaintiff agreed. But since the loan would be only for Defendant's benefit, and he would be solely responsible for paying the mortgage, Plaintiff needed to temporarily transfer her interest in the Homestead Lot to him in order for him to obtain the loan. Ex. A ¶ 13.

19.     On May 23, 1990, the Parties entered into a written agreement (attached as Exhibit B) wherein Plaintiff agreed to convey her one-half interest in the Homestead Lot to Defendant, temporarily, so he can obtain a loan in the amount of $136,500.00. Ex. A ¶ 14. The loan was secured by the Homestead Lot. *Id*. Defendant then reconveyed Plaintiff's interest back to her. *Id*. The Defendant agreed to repay any remaining mortgage once he received his share of the inheritance from their parent's estates. *Id*.

20.     Defendant fell behind on the monthly mortgage payments almost immediately and Plaintiff loaned him money for the payments to avoid foreclosure. Ex. A ¶ 15. As partial repayment, Defendant assigned to Plaintiff claims he had Sylmac Inc.'s bankruptcy case totaling $34,607.72. However, Plaintiff's payments on the mortgage exceeded that amount. As a result, Defendant agreed to repay Plaintiff personally from his inheritance for all of the money she loaned him towards the mortgage. *Id*.

21.     On or about July 23, 1993, the Parties memorialized their agreement regarding repayment of the amounts loaned to Defendant by Plaintiff for the mortgage payments. Ex. A ¶ 16.

The Parties signed a second contract (attached as Exhibit C) wherein Defendant agreed to repay Plaintiff all of the money she loaned him to pay the mortgage, including any moneys then due as well as future sums paid by Plaintiff, when inheritance funds were available for distribution from the estates. *Id.*

22. From July 1993 until 2008, Plaintiff continued to make monthly loans to Defendant to pay the mortgage. Ex. A ¶ 17. On or about January 5, 2008, Plaintiff made a lump sum payment of $105,067.73, to pay off the remaining balance of the mortgage. *Id.* Thereafter, Plaintiff would, at Defendant's request, loan him money to pay his share of the property taxes and insurance on the Homestead Lot. *Id.*

23. By 2000, 30 of the lots were sold and the funds were all used to pay Sylmac Inc.'s creditors. Ex. A ¶ 18. There was only one additional lot remaining, in addition to the Homestead Lot, which would come to be owned by the estates -- Lot 27.

## DEFENDANT'S BREACH OF THE ORAL AND WRITTEN CONTRACTS

24. On June 4, 2015, the Orphans' Court ordered Defendant, as the personal representative of his father's estate, to sell the final lot (Lot 27) owned by the estates, account for the proceeds and then close the father's estate. *See* Order, Ex. C.

25. Plaintiff anticipated that once Lot 27 was sold, the estates could be closed and final distributions paid. Ex. A ¶ 19. At that time, Defendant would be required to pay over his share of the inheritance to Plaintiff pursuant to the oral and written contracts. *Id.* However, the Parties struggled to find a buyer for Lot 27 and it was still unsold by early 2017.

26. Until 2017, Defendant had done nothing inconsistent with the Parties' oral and written contracts. Ex. A ¶ 20. And, because the estates remained open and had not been fully administered, Defendant's obligation to repay Plaintiff under the oral and written contracts had not

been triggered. *Id.*

27.     On or about August 14, 2017, Defendant filed a petition in his father's estate seeking personal representative commissions of $43,784.43. Ex. A ¶ 21. Plaintiff opposed the request because, if granted, Defendant's remaining inheritance (after netting out the commissions and expenses) would not cover the debt Defendant owed Plaintiff under the oral and written contracts. *Id.*

28.     At that time, the Defendant owed Plaintiff approximately $61,800.17 pursuant to their oral agreement. Ex. A ¶ 22. Of this amount, $17,178.00 was for work Plaintiff had done for the estates and Sylmac Inc. in connection with the litigation and at the agreed upon rate of $40.00 per hour. *Id.* The sum of $1,040.00 was compensation for Plaintiff's travel time to attend hearings in Maryland which were related to the estate litigation. *Id.* And $43,582.17, was for expenses Plaintiff had advanced Defendant in connection with the administration of their father's estate and Sylmac Inc. *Id.*

29.     On October 30, 2017, Plaintiff filed a claim against her father's estate, to try and recover from the estate some of the administration expenses she advanced on Defendant's behalf, and also compensation for work she had performed on his behalf. Ex. A ¶ 23. The Plaintiff did not present the issue of Defendant's individual liability to her for the debt to the Orphans' Court and the Court did not address that issue. *Id.*

30.     On October 31, 2017, during a hearing before the Orphans' Court on, *inter alia*, Defendant's request for personal representative's commissions, Plaintiff's objections thereto, and Plaintiff's claim for administrative expenses, Defendant disclaimed for the first time that he had any agreement with Plaintiff to pay her $40.00 per hour for work she performed for the estates and Sylmac Inc., thus breaching their prior oral contracts. *See* Transcript at 62-63, Ex. D; Ex. A ¶ 24.

Plaintiff brought this lawsuit shortly thereafter.

31.     After the October 31, 2017 hearing, the Orphans' Court allowed Plaintiff's claim against her father's estate in the amount of $41,759.74, ordered Defendant to account for this as an estate expense, file several amended accounts and a final account no later than March 14, 2018, close the estate distribute the remaining residue to himself and Plaintiff. *See* Order ECF No. 82-4. However, Defendant refused to comply with the order and account for Plaintiff's expenses claim (as granted), and close the estate so that distributions could be made and he could then repay Plaintiff from his inheritance pursuant to their written agreement. Ex. A ¶ 24. Plaintiff considered Defendant's actions in 2017 an unequivocal breach of the 1993 written agreement. *Id*.

**DEFENDANT OCCUPIES THE HOMESTEAD LOT, FAILS TO MAINTAIN THE PROPERTY CAUSING DAMAGE, AND EXCLUDES PLAINTIFF FROM IT**

32.     The Homestead Lot was well maintained, with no damage, when the Parties' parents passed away. Ex. A ¶ 25. An estate appraisal was performed for the father's estate on September 20, 1990. *See* Appraisal, Ex. E. As to the Homestead Lot, the appraisal indicates that "the interior condition of the house [Homestead Lot] is good, with no obvious maintenance required" and that the "exterior is in good condition with no obvious maintenance required." *See* Ex. E. As to the separate apartment, which the appraisal described as a "two story block foundation and framed apartment/garage combination," the appraisal reported it was in "average" condition, with exterior maintenance required such as painting and some shingle repair needed." *Id*.

33.     Defendant and his family have lived in the family home located on Homestead Lot since the parents passed away. Ex. A ¶ 26. During the period 1989 to 2002, Plaintiff and her family would regularly visit Maryland from Kentucky, sometimes multiple times a year, and would stay in a separate apartment located in one of detached buildings on the Homestead Lot. *Id*. The

apartment was on the second floor of the building and was only accessible using a wooden staircase which led to a wooden landing where the door was. *Id*.

34.     Plaintiff kept her personal property in the apartment and furnished it herself. Ex. A ¶ 26. The unit remained locked when Plaintiff was not visiting, though both she and her brother had a set of keys. *Id*. In or around 2002, the Defendant removed Plaintiff's belongings from the apartment and rented it to several individuals whom she did not know, thereby depriving Plaintiff of the ability to use it or access it. *Id*.

35.     Similarly, Defendant restricted Plaintiff's access to the family home after the passing of their parents. Ex. A ¶ 27. Plaintiff could not visit the Homestead Lot without calling Defendant first and notifying him, and she could not enter the family home without Defendant or a member of his family present. When Plaintiff would stay at the family home, Defendant controlled which areas of the home she had access. *Id*.

36.     In late 2009 or early 2010, Defendant removed the only point of access to the second-floor apartment, a wooden staircase. Ex. A ¶ 28. He never replaced it. Without the stairs, there is no way for Plaintiff to enter the unit safely to inspect it. *Id*.

37.     Because Defendant restricted Plaitniff's access to certain areas of the Homestead Lot, including basement and attic in the family home and the detached apartment, Plaintiff had no way of knowing the nature and extent of the damage caused by the Defendant's neglect of the Homestead Lot and failure to perform basic maintenance to integral systems such as the heating and sewer system. Ex. A ¶ 29. Plaintiff also visited in the summer months, when the heat would not be on, so she would not have discovered the furnace had stopped working. *Id*. As the Parties' relationship worsened, Plaintiff was rarely able to visit the property. *Id*. Her last time inside the family home was in or around August 2018.

38.     Until 2018, Defendant never told Plaintiff about the problems with the Homestead Lot and the repairs that needed to be done. Ex. A ¶ 30.

39.     In August 2018, the Defendant told Plaintiff for the first time that a septic line on the property was broken. Defendant had excavated the site to try and repair it himself. Defendant had never previously indicated to Plaintiff that any major repairs were need on the property and after this Plaintiff suspected that Defendant was neglecting the property and deferring necessary repairs. Ex. A ¶ 30. Plaintiff suspected there were other significant problems which Defendant was hiding from her. *Id*. Plaintiff filed this lawsuit shortly thereafter in October 2018. *Id*.

40.     After this lawsuit was filed, Plaintiff obtained two appraisals of the Homestead Lot. Each appraiser performed an onsite inspection. Ex. A ¶ 31. Based on the reports, Plaintiff confirmed there was damage to the Homestead Lot which needed to be repaired. *Id*. Notably, the well pipes were damaged, the furnace was not working, and had not worked in several years, the outbuildings on the property needed to be demolished due to disrepair, there was water damage in the basement, settling in the sunroom, and the radiant baseboard heating system was damaged and had been for some time. *Id*.

41.     The damage was in areas of the home Plaintiff did not have access to, and or would not have necessarily recognized as a problem if she did see it as she is a layperson with no specialized knowledge in construction or home remodeling. Ex. A ¶ 31.

**THE HOMESTEAD LOT CANNOT BE PARTITIONED IN KIND**

42.     In or around September 21, 2016, Defendant, through a third-party company called Terrain Inc., petitioned the Anne Arundel County Office of Zoning and Planning for a density variance which would allow the subdivision of the Homestead Lot. Ex. A ¶ 32. Defendant has continued to work towards subdividing the Homestead Lot without Plaintiff's permission or

authorization. *Id.*

43.     The Defendant's purpose of subdividing the Homestead Lot was to enable him and Plaintiff to each receive a separate parcel from the larger Homestead Lot as inheritance. Ex. A ¶ 33. Plaintiff has never agreed to this. *Id.*

44.     The Defendant proposed subdividing the Homestead Lot, referred to as Lot 28R, into two lots, Lot 28R-A, consisting of 2.6 acres and containing the family home, and Lot 28R-B, containing 1.7 acres of undeveloped land. Ex. A ¶ 34.

45.     Plaintiff does not agree that the Homestead Lot should be subdivided in the manner proposed by Defendant because the two hypothetical parcels that would result from the subdivision (Lot 28R-A and Lot 28R-B) are not equivalent in terms of size and market value. Ex. A ¶ 35. The family home located on the Homestead Lot cannot be equally partitioned without destroying it. *Id.*

46.     Plaintiff has performed two appraisals of the Homestead Lot, with each appraiser providing a comparative value for: (1) the Homestead Lot in its entirety; (2) Lot 28R-A; and (3) Lot 28R-B. Ex. A ¶ 36.

47.     An appraisal performed in February 2020, estimated the value of the entire Homestead Lot as $439,000.00, the value of Parcel 28R-A at $323,000.00, and the value of Lot 28R-B at $145,000.00. Ex. A ¶ 36; 2020 Appraisals, Ex. F[3].

48.     A second appraisal performed in February 2021 puts the market value of the entire Homestead Lot at $460,000.00, and the hypothetical values of Lot 28R-A at $410,000.00 and Lot

---

[3] The three individual appraisals are attached as part of Exhibit F but are separately labeled within Exhibit F as: (1) F1 – entire Homestead Lot; (2) F2 – proposed Lot 28R-A; and (3) F3 – proposed Lot 28R-B.

28R-B at $136,000.00. Ex. A ¶ 36; 2021 Appraisals, Ex. G[4].

**STANDARD OF REVIEW**

In order to be entitled to summary judgment, the movant must demonstrate that there is no genuine dispute as to any material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1986). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact exists and the motion must be denied. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-249 (1986). The facts themselves and the inferences drawn from them, must be viewed in a light most favorable to the opposing party. *Id*. at 255. When the parties offer "dueling affidavits" with substantially different accounts, summary judgment is usually not proper. *Stout v. Reuschling*, Civil Action No. TDC-14-1555, 2015 U.S. Dist. LEXIS 39997, at *22 (D. Md. 2015); *See also JFY Props. II LLC v. Gunther Land, LLC*, Civil Action No. ELH-17-1653, 2019 U.S. Dist. LEXIS 170199, at *35-36 (D. Md. 2019) (" … in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility."). This makes sense, because "where opposing affidavits duel for the key to a dispositive issue, affidavits often prove a poor substitute for live testimony." *Allegheny Energy, Inc. v. DQE, Inc*., 171 F.3d 153, n.19 167 (3d Cir. 1999).

---

[4] The three individual appraisals are attached as part of Exhibit F but are separately labeled within Exhibit G as: (1) G1 – entire Homestead Lot; (2) G2 – proposed Lot 28R-A; and (3) G3 – proposed Lot 28R-B.

## ARGUMENT

### I.  COUNT IV – CONTRIBUTION

Plaintiff agrees that she is not entitled to a money judgment against Defendant individually based on a theory of contribution as to any payments she made on his behalf outside the 3-year limitations period. However, any amounts she paid are still properly included as part of Plaintiff's unjust enrichment claim (Count IX) as well as breach of written contract claim (Count VII), both of which did not accrue until October 2017, and are thus timely. Plaintiff also has claims for contribution against Defendant individually, for which she would be entitled to money judgment against Defendant individually, which fall within the 3-year limitations period. This includes amounts she has paid towards Defendant's share of the property taxes and hazard insurance, which total approximately $6,152.41. CSUF ¶ 22. Thus, Count IV survives summary judgment to the extent there are claims within the three-year limitations period. Moreover, Plaintiff is entitled to an adjustment of equities when and if the Court orders a partition sale of the Homestead Lot for *all* payments that she made on Defendant's behalf, including any that fall outside the three-year limitations window. Defendant concedes this. *See* ECF No. 82 at 5 n.1.

### II.  COUNT V – EQUITABLE LIEN

Defendant argues he is entitled to summary judgment on this count because there is no evidence of an "intent" on his part to create a lien, and such evidence is required under Maryland law. ECF No. 82 at 5. Defendant is incorrect and Plaintiff has an equitable lien under two theories. First, under equitable subrogation, a lien arises in favor of Plaintiff because she paid Defendant's mortgage to prevent a foreclosure of her interest in the Homestead Lot. As a result, Plaintiff may enforce whatever rights the mortgagor had under the original security instrument against the Defendant. Moreover, the common law of contribution in Maryland has long held that when a co-

tenant pays the entire mortgage or other expenses for a property, he has an equitable lien against the entire property for that amount. Neither theory requires evidence of intent in order to establish an equitable lien.

Maryland recognizes conventional, statutory, and legal subrogation. *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 311 (2007). "Broadly defined, subrogation is the substitution of one person in the place of another with reference to a lawful claim or right." *Rinn v. First Union Nat'l Bank of Md.*, 176 B.R. 401, 407-08 (D.Md. 1995). "The party subrogated acquires all rights, securities, and remedies the creditor has against the debtor and is regarded as constituting one and the same person with the creditor whom he succeeds." *Id.* The outcome does not change merely because the original lien holder's debt has been satisfied and the original lien released. *Id.* " … [T]he doctrine of equitable subrogation operates to keep a lien alive in favor of one who has paid the lienholder, even though the latter has satisfied and discharged the lien of record, as long as the loan was made for the purpose of discharging the prior encumbrance." *Id.* (collecting cases); *See also Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 412, 559 A.2d 365, 368 (1989) ("Resting upon the Court's equitable powers, the doctrine of equitable subrogation is a legal fiction under which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of the third person, with the third person succeeding to the rights of the initial creditor in relation to the debt."); *Hogan v. McMahon*, 115 Md. 195, 197, 80 A. 695, 696 (1911) ("Where a tenant in common discharges a mortgage upon the joint property, equity treats him as an assignee of the mortgage as against his co-tenants interest in the property, and this though no actual assignment is made.") Equitable subrogation requires that: (1) there is a debt which a party other than the subrogee owes, and (2) the subrogee paid the debtor's loan to protect his or her own rights, not as a volunteer. *Fishman v. Murphy*, 433 Md. 534, 554, 72 A.3d 185 (2013) (citations omitted).

The original loan from the mortgagor to Defendant was secured by a mortgage against the Homestead Lot, which the Parties own, in equal parts, as co-tenants. When Defendant defaulted on the mortgage, the mortgagor threatened to foreclose on the property. To protect her interest, and at Defendant's request, Plaintiff loaned the Defendant the sums necessary to pay the mortgage debt, and ultimately paid the entire mortgage in full. Plaintiff did so to protect her rights in the property and not gratuitously. Under the doctrine of equitable subrogation, an equitable lien arises in favor of Plaintiff by virtue of her having paid the Defendant's debt. Plaintiff then steps into the shoes of the mortgagor and possesses the same lien rights that it had. Defendant relies on *Pence v. Norwest Bank Minn., N.A.,* but that case is distinguishable because it was not an equitable subrogation case and there was no valid security instrument in *Pence* as there is here. 363 Md. 267, 280, 768 A.2d 639, 646 (2001).

Alternatively, the equitable lien arises because the Parties' are co-tenants and it is the law in Maryland that when one tenant pays a mortgage or other encumbrance upon the common property, he is entitled to contribution from his co-tenants to the extent to which he has paid their share, and is entitled to an equitable lien for the amount due him. *See Hogan*, 115 Md. 195, 197, 80 A. 695, 696 (1911); *Meyers v. E. End Loan & Sav. Ass'n*, 139 Md. 607, 608, 116 A. 453, 454 (1922); *Pino v. Clay*, 251 Md. 454, 456, 248 A.2d 101, 102 (1968). Thus, under either theory (equitable subrogation or co-tenant contribution) the Court need not delve into whether there is evidence of an intent to create as between Plaintiff and Defendant and Defendant's motion for summary judgment as to Count V should be denied.

## III.  COUNT VI - WASTE

As a threshold matter, Defendant mistakenly characterizes Count VI as being pled only as to waste committed vis-a-vis the "separate building" on the Homestead Lot. ECF No. 82 at 5. But

Count V contains no such limitation. The language of Count VI is broad and encompasses waste to the entire "Homestead Property". Thus, Defendant is not entitled to summary judgment on the entirety Court VI.

Defendant argues specifically that the detached apartment, "could not and cannot be used legally as a residence" and that its only use is as a storage shed. ECF No. 82 at 5. Therefore, Plaintiff has not suffered any damage as a result of the waste, even if the apartment is uninhabitable, because the building can still be used as a storage shed. *Id*. Notably, Defendant does not dispute that the structure is "in poor condition and uninhabitable" or that he caused damage to the structure by, for example, removing the stairs to the apartment at some unspecified date. ECF No. 82-1 ¶ 16. Instead, he myopically assumes that the only measure of Plaintiff's damages is lost rental income. However, Plaintiff is entitled to the actual damages suffered as a result of the waste committed by the Defendant to the entire Homestead Lot. *Coutant v. Coutant*, 86 Md. App. 581, 595, 587 A.2d 1125, 1132 (1991) ("in Maryland a tenant is liable for the actual damage suffered by the property caused when he or she commits waste."). This includes the cost of ameliorating any physical damage to the property which negatively affects its value, and is not limited to lost rents. The other flaw in Defendant's argument is it, on its face, establishes a dispute of material fact because the question whether Defendant's acts or omissions constitute waste is one of fact to be resolved by the trier of fact at trial. *See Id.* ("Whether a particular act constitutes waste is generally considered a question of fact for the trier of fact dependent upon condition and usages, character of the premises, and reasonableness of use.").

The Court must also disregard Defendant's testimonial evidence about the apartment because is not based on his personal knowledge. *See* ECF No. 82-1 ¶ 15. Defendant states that "upon information and belief" the structure started out as a tractor shed, that "[he] has learned" that

the structure is not code compliance and that "it must be approved for a separate septic" system. Statements such as these run afoul of Federal Rule 56's requirement that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). Since Defendant's statements (ECF No. ¶¶ 10-13, 15) fall short of what Rule 56 requires, they must be disregarded by the Court for purposes of summary judgment.

Finally, Defendant argues this claim is barred by the 3-year statute of limitations because, to the extent waste occurred, it was before October 28, 2015, and Plaintiff knew about it, or could have discovered it with reasonable diligence prior to that date. ECF No. 82 at 5. Defendant is wrong because by interfering with Plaintiff's access to parts of the Homestead Lot and restricting it, he prevented Plaintiff from learning about the waste until, at the earliest 2018, and Plaintiff could not have discovered it sooner because of Defendant's conduct. Under the Discovery Rule, which governs when limitations began to run on Plaintiff's waste claim, when "stealth, subterfuge, or other difficulties of detection" prevent a plaintiff from learning of the facts and circumstances which entitled them to relief, the statute does not run until the plaintiff actually knows or should know through the exercise of reasonable diligence of the wrong." *Murphy v. Merzbacher*, 346 Md. 525, 532, 697 A.2d 861, 864-65 (1997). The discovery rule requires "actual knowledge – that is express cognition, or awareness implied from knowledge and circumstances which ought to have put a person of ordinary prudence on inquiry with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981) (quoting *Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 402, 250 A.2d 69, 75 (1969)).

Whether this standard has been met, and limitations has begun to run, is a determination which may be based solely on law, solely on fact, or on a combination of law and fact. *Hecht v. Resolution Tr. Corp.*, 333 Md. 324, 334, 635 A.2d 394, 399 (1994). Where there is a factual dispute as to whether an individual has knowledge has the requisite knowledge, summary judgment is not proper. *See Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981) ("However, there is reflected a factual dispute regarding whether, sometime prior to that survey, the petitioner possessed knowledge from which actual notice may be inferred. Consequently, the granting of summary judgment was error and its entry must be reversed."); *See also Clarks v. Private Money Goldmine*, No. GJH-19-1014, 2020 U.S. Dist. LEXIS 33191, at *13 (D. Md. 2020) ("***Unless there is a dispute as to when a plaintiff possessed the requisite degree of knowledge***, the question of when the cause of action accrued is a legal determination for the court.")

Here, there is a factual dispute as to when Plaintiff knew or should have known about the waste which precludes summary judgment. Assuming the facts in a light most favorable to Plaintiff, and drawing all reasonable inferences from those facts in her favor as the Court must, the trier of fact can conclude that the earliest Plaintiff knew of the waste was in August 2018, when Defendant told her about damage to the underground septic system, thereby putting her on inquiry notice that other damage may exist. CSUF ¶¶37-40. Prior to that time, Plaintiff could not have discovered the waste because Defendant prevented from accessing certain areas of the Homestead Lot. CSUF ¶¶33-37. In or around 2002, he moved Plaintiff's belongings out of the apartment and rented it to someone else. CSUF ¶34. In 2009 or 2010, Defendant removed the only means of accessing the apartment, the staircase, and never replaced it. CSUF ¶36. Thus, since approximately 2002, Plaintiff has been unable to gain access to the apartment to investigate its condition and could not have discovered the nature and extent of the waste committed by Defendant. CSUF ¶37.

And while Plaintiff visited Homestead Lot at varying times since and was permitted by the Defendant to enter the family home, her access to certain areas, such as the basement where the water damage was, were restricted by the Defendant. CSUF ¶¶35-37. Plaintiff also could not visit the Homestead Lot without first notifying the Defendant because he, or a member of his family needed to be there to accompany Plaintiff around the property, particularly when she entered or stayed in the family home. CSUF ¶37. Plaintiff also visited in the summer months, so she would not have discovered or had reasons to suspect that the furnace and baseboard heating system inside the house were not working. *Id*. And to the extent Plaintiff was able to observe certain areas of the home on her visits, because she is a lay person with no knowledge about building codes or construction, the damage caused by the Defendant's neglect, such as the settling in the sunroom, problems with the underground septic system or well pipes, would not be readily apparent to her. CSUF ¶41. And, even if the Court finds that the running of limitations bars some of Plaintiff's claim, it is premature to make a determination on summary judgment what damages fall within the limitations period and which occurred within the three years, because there is a dispute of material fact about when Plaintiff was on notice of the waste. Such a determination is fact intensive, and will require the trier of fact to weigh testimony and evidence and make credibility determinations. Accordingly, summary judgment on Count VI is not appropriate.

## IV.   COUNT VIII – BREACH OF ORAL CONTRACT

Defendant first argues that part of Count VIII is barred by the doctrine of collateral estoppel. ECF No. 82 at 6-7. Notably, Defendant does not appear to be arguing that the entirety of Count VIII is barred, he is only narrowly arguing that Plaintiff is not entitled to reimbursement for services rendered to her father's estate at the rate of $40.00 per hour, and her travel time. *Id*. The value of these claims is approximately $19,000.43. CSUF ¶28. But Count VIII also contains a claim for

expenses which Defendant promised to pay individually, and that part of the claim is valued at approximately \$43,582.17. *See* ECF No. 1 ¶¶ 52-55. Thus, even if the Court grants summary judgment as to this Count, it should only be as to this limited category advocated for by the Defendant - services rendered to father's estate at the rate of \$40.00 per hour – and the remainder of Count VIII should proceed to trial. Defendant argues two theories bar the claim for compensation for services rendered: (1) Collateral Estoppel; and (2) Statute of Frauds. Both arguments fail.

### A. COUNT VIII IS NOT BARRED BY COLLATERAL ESTOPPEL

The Defendant myopically focuses on a single line from a written decision issued by the Orphans' Court for Anne Arundel County, Maryland, adjudicating, *inter alia*, the Plaintiff's request for reimbursement of funds from her father's estate. ECF No. 82 at 7. In doing so, he deliberately mischaracterizes the scope of the Orphans' Court decision and attempts to expand it to Plaintiff's claim in this case. But the Orphans' Court never adjudicated the issue now before this Court, *i.e.*, if Defendant is individually liable for breach of contract to Plaintiff. That issue was never before the Orphans' Court, so its decision cannot, under any reasonable interpretation, be expanded as Defendant argues. The Defendant has, once again, conflated the Orphans' Court proceedings with the claims alleged against him individually. This Court has already rejected this argument:

> More importantly, Plaintiff's claims in this Court assert not only Defendant's failure to reimburse Plaintiff for services performed for their father's estate, but also Defendant's failure to reimburse Plaintiff for his share of costs and expenses related to Sylmac, as well as other out of pocket expenses Plaintiff allegedly advanced on his behalf. *See* ECF 1 ¶¶ 52-55, 60-64. Count VIII alleges, "the Parties agreed orally to share expenses associated with Sylmac, Inc.," and Defendant agreed "to pay Plaintiff for services rendered to their father's estate at the rate of \$40.00 per hour and reimburse her for expenses." *Id.* ¶ 53. Similarly, Count X alleges, "Plaintiff rendered valuable services to the Defendant by performing services including but not limited to accounting, tax preparation, assisting counsel with legal research and document review and preparation, in connection with the development of the Twin Hills subdivision and in connection with aiding the Defendant as the Personal Representative of their father's estate." *Id.* ¶ 61. Accordingly, Plaintiff's claims in

this Court for services performed on behalf of Defendant, some of which also relate to their father's estate, are distinct from Plaintiff's claim against their father's estate in probate.

ECF No. 25 at 17-19. This same rational forecloses Defendant's collateral estoppel argument now.

Plaintiff agrees with the applicable standard for collateral estoppel as cited by Defendant (ECF No. 82 at 6-7) but disputes that the requisite elements are met. As to the first element, the issue presented in this case is markedly different from the issue decided by the Orphans' Court. The legal question that the Orphans' Court resolved was whether Plaintiff's claimed expenses, from her father's estate, were "legitimate expenses of estate administration advanced to the estate by Ms. McCartney." *See* ECF No. 82-4 at 3. The Orphans' Court agreed with Plaintiff in part, finding that Plaintiff was entitled to reimbursement for expenses in the amount of $41,759.74. *Id*. The Court ordered Defendant, as personal representative, to "account for this as an expense of the estate." *Id*. The Orphans' Court denied the request for services and travel time (valued at $19,000.43) because this was not a legitimate expense of administration. *Id*. As made clear by the Orphans' Court in its order, the issue of whether a claimed expense should be allowed as an administrative expense depends on the nature and purpose the expense. The Orphans' Court said as much: "[e]xpenses such as phone/facsimile/photocopy/postage costs, taxes, loan payments, repairs, attorneys' fees and marketing costs are legitimate expenses." ECF No. 82-4 at 3. Whether Defendant is also individually liable to Plaintiff for some or all of these expenses was not part of the Court's analysis and for this reason, the third element of collateral estoppel ( the issue was critical and necessary to judgment in prior proceeding) is also not met in this case.

Plaintiff also did not have a "full and fair opportunity to litigate the issue [of Defendant's individual liability] in the prior proceeding" (fifth element). ECF No. 82 at 7. The Plaintiff never asserted a claim against the Defendant individually in the Orphans' Court (CSUF ¶ 29) and this

issue was not, and could not have been, litigated previously because the Orphans' Court is a court of limited jurisdiction, expressly conferred by statute. *See Fowler v. Brady*, 110 Md. 204, 208, 73 A. 15, 16 (1909) ("the orphans' court is a court of limited, and not general, jurisdiction, and can only exercise such jurisdiction as has been expressly conferred upon it by statute."). The Orphans' Court cannot exceed its jurisdiction as the legislature has said that "[t]he orphans' court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred." MD. CODE ANN. EST. & TRUSTS 2-102(a). The Maryland Code provides, that ("[t]he [Orphans' Court] may conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent." MD. CODE ANN. EST. & TRUSTS 2-102(a)(1). The Court of Appeals has construed this language to mean that the court can "administer the estates of deceased persons," "entertain petitions of interested persons and resolve their questions concerning an estate or its administration," and "pass orders relating to the settlement and distributions of the estate." *In re Estate of Parikh*, Nos. 1480, 1655, 501, 2312, 302, 2020 Md. App. LEXIS 295, at *21 (Md. Ct. App. 2020). There is no authority in the statute or case law that holds the Orphans' Court can adjudicate a breach of contract dispute between two private individuals where the relief sought is a money judgment for damages. Defendant certainly has not cited any such authority.

Read in context, the Orphans' Court's order is consistent with this limitation and does not exceed it: " … it is the opinion of this Court that neither party shall be compensated for effort, time, travel, etc. *as the remaining assets of the estate shall be split equally after all legitimate expenses of estate administration are paid*." ECF No. 82-4 (emphasis supplied). It is clear that the Orphans' Court only decided the issue of whether the Plaintiff's claims were legitimate expenses of administration, and expenses of administration do not include effort, time and travel. But it cannot

be said, based on this language, that the Orphans' Court intended the scope of its order to preclude Plaintiff from brining a civil action against Defendant individually for breach of contract based on his promise to personally repay her for her effort, time, travel and expenses.

Defendant also argues that pursuant to Section 8-109 of the Maryland Estates and Trusts Article Maryland law, he cannot be individually liability to Plaintiff. ECF No. 82 at 7. Section 8-109(a) specifically addresses contract claims against personal representatives and states that the limitation on individual liability conferred by statute *only* applies to contracts entered into by the personal representative in his "fiduciary capacity" and "in the course of administration." MD. CODE ANN. EST. & TRUSTS ART. §8-109. Plaintiff disputes that the contract in question was entered into by the Defendant in his fiduciary capacity and in the course of administration. Notably, the first oral agreement in 1989, for repayment of estate expenses, was made before Defendant was even appointed as personal representative. CSUF ¶10. Other than his self-serving affidavit testimony (ECF No. 82-1 ¶8), Defendant has no evidence to the contrary. In a case where the dispute centers around competing affidavit testimony, summary judgment is not proper because the outcome will hinge on a credibility determination and a weighing of the evidence. *Stout v. Reuschling*, Civil Action No. TDC-14-1555, 2015 U.S. Dist. LEXIS 39997, at *22 (D. Md. 2015). Moreover, the Section 8-109 states that a personal representative *can waive the limitation on liability by* "expressly" agreeing to individual liability. *Id*. Plaintiff has alleged precisely this. CSUF ¶¶ 10-13. So even if the trier of fact believes Defendant, and finds the agreement was entered into by Defendant in a fiduciary capacity, the statue would not bar his individual liability because he waived its protections by agreeing to be individually liable to Plaintiff and to repay her personally when he received his inheritance.

## B.    COUNT VIII IS NOT BARRED BY THE STATUTE OF FRAUDS

Defendant next argues in conclusory fashion that MD. CODE ANN., EST. & TRUSTS 8-109(i) (the Maryland Statute of Frauds) bars Plaintiff's claim because the alleged oral agreement is not evidencing in writing. ECF No. 82 at 7-8. The specific section Defendant relies upon deals with promises made by a personal representative. But Defendant completely misunderstands the meaning of this provision, which has no application to the instant agreement by Defendant to pay a debt specific to him and not a debt of the decedent. Plaintiff was unable to locate a Maryland case interpreting this provision of the statute of frauds, but there is a plethora of decisions from courts in other states, which have codified the statute of frauds using near identical language. While not binding or persuasive, those cases are helpful to the Court. These cases hold that a promise, like the one at issue here, by a personal representative to a third-party to pay for services rendered in connection with the administration of his estate (the estate of which he is the executor) is not within the statute of frauds. *See Brown v. Quinton*, 86 Kan. 658, 663, 122 P. 116, 118 (1912) (An administrator's oral agreement to pay for legal services rendered in proceedings instituted by him in behalf of the estate is not within the statute of frauds, where the credit is extended to him personally, even though he can receive no benefit from the litigation."). Instead, the statute applies to promises by the personal representative to pay the debt of the decedent, which then becomes a debt of the estate. *Id*.

Where the promise by the personal representative is new and specific to the personal representative, as opposed to a promise made by the decedent, then the statute of frauds does not apply. *See Bellows v. Sowles*, 57 Vt. 164, 171 (1884); *Pratt v. Humphrey*, 22 Conn. 317, 321 (1853) (The meaning of this clause is, ***that a promise to discharge demands against the deceased***, out of the executor's estate, must be in writing.") (emphasis supplied) (both cases construing near identical

language to that in Section 8-109). The debt alleged in Count VIII of the complaint is not within the statute of frauds because it is not a debt of the decedent – Caldwell McMillan Sr. Instead, it arises from Defendant's personal promise to pay Plaintiff for services rendered to him, to assist him with fulfilling his obligations as personal representative. CSUF ¶¶ 10-13. This is a clear distinction, which Defendant fails to acknowledge, and which is fatal to his argument. *See In re Estate of Reed*, No. E2015-02372-COA-R3-CV, 2016 Tenn. App. LEXIS 604, at *1 (Ct. App. Aug. 22, 2016) ("The personal representative's obligations contracted in the course of his administration, although proper charges against the estate, are his private debts for which he is personally liable and oral promises of this nature, such as promises to pay for merchandise, legal services, a broker's commission, and funeral expense, are original undertakings and not within the statute.").

Here, the oral contract which was entered into by the Parties was not an agreement by the Defendant to pay an existing debt of the decedent. It was a brand-new promise to pay Plaintiff for expenses advanced and services rendered, not only to the estate but also in connection with the operation of Sylmac, Inc. *See* CSUF ¶¶ 10-13. Defendant tries to get around this by mischaracterizing Plaintiff's claim against him as a debt "the estate purportedly owed her," but this is patently false. ECF No. 82 at 8. Plaintiff has never alleged that her claim is based on a promise made by her father, the decedent, and there is no support in the record to support Defendant's claim as Plaintiff's father passed away before the Parties' oral contract was formed. CSUF ¶¶ 2, 10, 13. And just because the personal representative can seek payment from the estate for the expenses of administration, this does not transform Plaintiff's claim against him individually to a debt of the estate. Accordingly, the oral contract at issue is not within the statute of frauds and Defendant is not covered by MD. CODE ANN., EST. & TRUSTS 8-109(i) and summary judgment must be denied.

## VI.    COUNT IX – UNJUST ENRICHMENT

Defendant argues the Plaintiff's claim for unjust enrichment is barred by the three-year limitations as to any claims arising before October 28, 2015. ECF No. 82 at 8-9. Defendant is wrong because the unjust enrichment claim accrued no earlier than October 2017 and March 2018, when the Defendant breached the Parties' oral and written agreement through his statements at the hearing, and by his subsequent conduct in refusing to close the father's estate and distribute the residue as inheritance as ordered by the Orphans' Court. CSUF ¶¶24-31. Plaintiff's unjust enrichment claim contemporaneously with the Defendant's breach of the Parties' oral and written contracts. *See Yingling v. Phillips*, 65 Md. App. 451, 460, 501 A.2d 87, 92 (1985) ("In a contract matter a cause of action accrues when there is a breach or at least an anticipatory breach of the contract.") Therefore, the claim for unjust enrichment accrued at the same time as the breach (October 2017) and is not time barred. Prior to the breach, Defendant had not been unjustly enriched because the Plaintiff still believed, and had no reason not to, that the Defendant was going to repay her any amounts owed pursuant to their written and oral contract, when final distributions made to the Parties from their parents' estates, and event which had not occurred (CSUF ¶26). *See Clarks v. Private Money Goldmine*, No. GJH-19-1014, 2020 U.S. Dist. LEXIS 33191, at *15 (D. Md. 2020) (unjust enrichment accrues when a plaintiff knows or should have known that a defendant has been unjustly enriched and finding unjust enrichment claim and breach claim accrued contemporaneously); *Mace v. Domash*, No. 05-02244 (HHK), 2008 U.S. Dist. LEXIS 142407, at *12 (D.D.C. Dec. 1, 2008) (limitations on unjust enrichment accrued when plaintiff learned he would not be compensated pursuant to agreement). Because the breach of contract claims and the claim for unjust enrichment arise out of the same operative facts, they accrued simultaneously, at the time of the alleged breach, in or around October 2017, and after March 2018. Accordingly, the

unjust enrichment claim is not time barred and the Court should deny summary judgment.

## VI.   COUNT X – QUANTUM MERUIT

Defendant first argues that Plaintiff's claim for *quantum meruit* seeking the reasonable value of the services she provided to Defendant is barred by the doctrine of collateral estoppel. ECF No. 82 at 9. Plaintiff disagrees for the same reasons set forth in Paragraph IV(A) above. The Orphans' Court proceeding determined whether Plaintiff had an allowable claim against her father's estate for administrative expenses and that is all. It did not adjudicate any claim against the Defendant individually for money damages. Accordingly, the Plaintiff is not now collaterally estopped, by virtue of the Orphans' Court proceedings, from asserting a claim against Defendant individually for money damages based on a theory of quantum meruit, any more than she is from asserting the contract claim.

Defendants next argue that "there is no theory on which a *quantum meruit* claim for services to the Estate can be made against [Defendant] personally." ECF No. 82 at 9.  Defendant is wrong because he is, once again, conflating the estate proceedings this the claims against Defendant individually, which are at issue in this case. To make out a claim for *quantum meruit*, Plaintiff must establish: (1) that she rendered valuable services to Defendant; (2) that Plaintiff intended to receive compensation for those services; and (3) that the services were rendered under such circumstances that reasonably notified Defendant, that Plaintiff, in providing the services, intended to be compensated. *See Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt.*, 988 F. Supp. 2d 542, 554 (D. Md. 2013). Viewing the facts in the light most favorable to Plaintiff, the Court can conclude that Defendant and Plaintiff entered into an oral agreement for Plaintiff to render services to Defendant and that Defendant benefited as a result of those services. CSUF ¶¶ 10-16. Specifically, Plaintiff prepared documents which had to be filed in the estate of the Parties' father, prepared tax returns

for the estate, estate accountings, and other documents and did legal research and drafting to reduce the litigation costs in the lawsuits the Parties and Sylmac, Inc. were embroiled in. CSUF ¶14. Plaintiff also advanced considerable sums towards expenses of the Parties' father's estate and Sylmac, Inc., including Defendant's share. CSUF ¶28, These were valuable services which benefited the Defendant because he would have otherwise been required to hire someone to perform these services and pay them himself. CSUF ¶16. The Plaintiff also intended to receive payment for all of these services, and Defendant knew this, because the Parties' discussed the fact that Plaintiff would charge $40.00 per hour for the work she did, and that each would be liable for one-half of the expenses incurred. CSUF ¶¶ 11-16. Consistent with this agreement, Plaintiff tracked the time she spent and expenses she incurred on detailed spreadsheets for the purpose of later providing them to the Defendant when seeking reimbursement. CSUF ¶¶11, 14-15. The expenses were also documented on tax returns Plaintiff prepared and sent to Defendant for the estate and Sylmac Inc. CSUF ¶15. The fact that some of the services rendered to Defendant benefited Parties' father's probate estate, does not change the nature of the Plaintiff's claim vis-à-vis Defendant individually. *See United States ex rel. Asphalt Contractors v. Kar Contracting, Ltd. Liab*. Co., No. 3:14-27451, 2015 U.S. Dist. LEXIS 75512, at *9 (S.D. W. Va. 2015) (plaintiff stated claim for quantum meruit despite the fact that third party was ultimate beneficiary, where defendant benefited from plaintiff's services).

Finally, Defendant argues that the statute of limitations bars the entirety of the *quantum meruit* claim as the last task performed by Plaintiff was in 2014. This argument fails because this claim is based on, and arises from, the Defendant's breach of the Parties' oral contract. Plaintiff has alleged this breach did not occur until October 2017, when Defendant refuted for the first time that he ever had any agreement with Plaintiff to repay her for the services rendered. Thus, the *quantum*

*meruit* claim accrued at that time, when Plaintiff learned that she would not be receiving any payment from Defendant for these services.

## VII.    COUNT XI – OUSTER

Defendant essentially concedes there is a dispute of material fact as to this claim, which precludes summary judgment, by denying Plaintiff's allegation that he ousted her from the Homestead Lot. ECF No. 82 at 9. Merely denying an allegation in the complaint however, does not, alone, entitle Defendant to summary judgment. Viewing the facts in the light most favorable to Plaintiff, it is possible that the trier of fact would find that Defendant excluded Plaintiff from part of the property – the separate apartment – by removing her belongings, changing the locks, and letting someone else occupy the space to the exclusion of Plaintiff. CSUF ¶¶34-41. Defendant also removed the staircase to the unit in 2009 and has never replaced it, essentially blocking anyone from accessing it and let the property fall into such a state of disrepair that it became uninhabitable. *Id.* These acts constitute ouster. "An ouster, is some act adverse to the possession of another excluding him . . . ." and which often rises to the level of "an overt act that is a hostile invasion of another's rights." *White v. Pines Cmty. Improvement Ass'n*, 403 Md. 13, 35, 939 A.2d 165, 178 (2008).

Defendant then argues that the ouster claim is barred by limitations because no act of ouster occurred in the three-year period before the complaint was filed. This is wrong, the ouster continued through the three-year period preceding the filing of this lawsuit because during this time, Plaintiff was unable to use the detached apartment because it was uninhabitable due to its condition and also there was no point of access since Defendant had removed the stairs.  Plaintiff could not freely use the main dwelling house on the Homestead Lot because it was occupied by Defendant and his family.  Accordingly, because Defendant continued to maintain the detached apartment in an

uninhabitable state, and because the condition of the apartment continued to deteriorate, unabated, through the three-year period before this case was filed, Defendant ousted Plaintiff from the Homestead Lot and she has damages for such ouster within the limitations period. Therefore, summary judgment is not appropriate at this time.

## VIII.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HER CLAIM FOR SALE IN LIEU OF PARTITION

Plaintiff is entitled to summary judgment on Count I of the Complaint – Sale in Lieu of Partition - because the Homestead Lot, as a matter of law, is not subject to partition in kind without loss or injury to one of the Parties. Defendant will not be able to produce a shred of evidence to the contrary at trial. The Defendant may argue partition is possible because he is in the process of trying to subdivide the Homestead Lot into two separate lots. But the problem with this argument is Defendant seeks to create two lots which are radically different in size and market value. Plaintiff has retained an expert appraiser whose opinion is that the different in value is approximately $274,000.00. CSUF ¶¶42-48. Defendant has not designated a counter expert to challenge Plaintiff's opinion about the value and his time for doing so has passed. Moreover, the main dwelling house, the McMillan family home, would, hypothetically, be situated on only one lot Lot 28R-A and there is no way to equally partition the house without destroying it. CSUF ¶ 45. These facts are undisputed.

The Court's function at the summary judgment stage is to act as a gatekeeper to prevent factually unsupported claims and defenses from proceeding to trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Supreme Court explained the non-moving party's burden in responding to a motion for summary judgment as follows: [The nonmoving party] must do more than simply show that there

is some metaphysical doubt as to the material facts… In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial… Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Id.* at 586-87 (emphasis in original) (internal quotation marks omitted). "If the evidence [submitted by a party opposing summary judgment] is merely colorable…or is not significantly probative…summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive a motion for summary judgment. *Id.* at 252. The undisputed facts in this case establish that partition is not possible without loss or injury to the parties. The Accordingly, the Court should exercise its gatekeeper function and grant summary judgment to Plaintiff on this issue.

The Plaintiff's cause of action for partition is statutory. Specifically, MD. REAL PROP. CODE ANN. 14-107(a) states that partition may be decreed at the request of a co-tenant. *Id.* However, "if it appears that the property cannot be divided without loss or injury to the parties", a court may instead order a sale and divide the proceeds between the parties. *Id.* Md. Rule 12-401, states that when a party seeks a sale in lieu of partition, the court must first make a determination that partition is not possible without loss or injury to the parties. *Id.* Partition in kind is the right of a co-tenant. *Id.* But if partition is not possible, the right [instead] to a sale of the property, "as the only means of effecting partition," becomes "undeniable." *Johnson v. Hoover*, 75 Md. 486, 23 A. 903 (1892). The burden to show loss or injury from a partition is on Plaintiff. *Boyd v. Boyd*, 32 Md. App. 411, 419, 361 A.2d 146, 151 (1976). Merely because a property can be partitioned, does not mean that it should not be sold. *Thurston v. Minke*, 32 Md. 571 (1870). The "criterion is not whether there was a possibility that the tract could be partitioned in kind without loss or injury, but whether upon

the basis of a preponderance of the evidence it appears that the property could not be divided without loss or injury to the parties interested." *Id.*

In this case, the undisputed facts show partition in kind is not possible without injury to one of the Parties. The only method of partition in kind proposed by Defendant would create two lots that differ in terms of their size (2.6 acres versus 1.7 acres), and most importantly market price. CSUF ¶¶ 45. According to Plaintiff's expert, the difference in market price, as of February 2021, was a staggering $274,000.00. CSUF ¶¶47-48. Moreover, the family homestead, would be situated on only one lot – proposed Lot 28R-A. And there is no dispute that the home itself cannot be partitioned without destroying its value. CSUF ¶¶44-45. The Parties also cannot share use of the home because it's occupied by Defendant and his family. CSUF ¶¶33, 35. Defendant has not retained an expert and has not offered any evidence in discovery which would refute Plaintiff's claim that partition in kind is not possible. Accordingly, Defendant cannot do more than offer "unsupported assertions" at trial that there is a mere "possibility" that partition is possible, but this is not enough to overcome Plaintiff's claim. *See Boyd*, 32 Md. App. at 419, 361 A.2d at 151. Thus, the Court should therefore grant summary judgment in favor of Plaintiff on Count I, and enter a Judgment for Sale pursuant to Md. Rule 12-401, to be conducted in the manner provided by Title 14, Chapter 300 of the Maryland Rules.

## CONCLUSION

For the reasons stated, Defendant's motion for summary judgment should be denied, and Plaintiff's cross-motion for partial summary judgment should be granted.

Respectfully submitted,

/s/Andrew Balashov
Andrew Balashov
Maryland Bar No.: 19715
MELEHY & ASSOCIATES LLC
8403 Colesville Road, Suite 610
Silver Spring, MD 20910
Tel: (301) 587-6364
Fax: (301) 587-6308
Email: abalashov@melehylaw.com
*Attorneys for Plaintiff*