# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ELIZABETH MCMILLAN-MCCARTNEY,  )<br>                                                        )<br>      *Plaintiff*,                                 )<br>                                                        )<br>v.                                                    )     Civil Action No.: 1:18-cv-03331-CBD<br>                                                        )<br>CALDWELL MCMILLAN, JR.,            )<br>                                                        )<br>      *Defendant.*                             )<br>                                                        )<br>_____) | |

## DECLARATION OF ELIZABETH MCMILLAN-MCCARTNEY

I, Elizabeth McMillan-McCartney, am over the age of 18 and competent to testify about the matters set forth herein, of which I have personal knowledge.

1. The Defendant, Caldwell McMillan, Jr., is my brother. On January 16, 1989, our mother, Syliva Ross-McMillan, passed away. Our father, Caldwell McMillan Sr., passed away on December 3, 1989. Our father and mother died testate and under the will, my brother and I are the only legatees.

2. Immediately after our parents passed away, my brother and I opened estates for each of them in the Orphans' Court for Anne Arundel County, Maryland. My father's estate is styled *In the Matter of the Estate of Caldwell McMillan*, Sr., Estate No. 24,984 and my mother's estate is styled *In the Matter of the Estate of Syliva Ross McMillan*, Estate No. 24, 437, respectively. Both estates are still open and have not been fully administered.

3. Our parents owned a large tract of undeveloped land (approximately 100 acres) in Anne Arundel County, Maryland. During their lifetime, they began to subdivide the tract into individual lots with the goal of creating a subdivision, and selling the lots individually. In 1961, they formed a Maryland corporation called Sylmac, Inc., to hold, develop, market and sell the lots.

1

In the 1980s, the Parties' parents began a new subdivision project "Twins Hills." Sylmac Inc., borrowed a substantial sum of money to fund the Twin Hills development.

4. When our father passed away, there were 31 subdivided lots which had not been sold, plus the lot containing our family home, which was identified as 1886 Crownsville Road, Annapolis, Maryland ("Homestead Lot"). The Homestead Lot was designated in the land records as Lot 28R.

5. On April 25, 1990, my brother and I, in our capacity as the executors of our parent's estates, transferred from each estate, to one another individually, a one-half interest in the Homestead Lot. We presently still each own a 50% interest in the Homestead Lot as co-tenants.

6. My brother and I assumed control of Sylmac, Inc., and operated it with the goal of completing the Twin Hills subdivision started by our parents. We hoped that once the construction loan and other debts were paid off, the proceeds from the sale of the lots would pass to the estates and would eventually be distributed to my brother and I as inheritance.

7. When our father died on December 3, 1989, through his will, I was named as the executor of his estate. I had already been serving as the executor of my mother's estate since her passing. It was expected that both estates would be administered jointly, meaning a document filed in my mother's estate would also be deemed filed in my father's estate. Since I was already the executor of my mother's estate, I planned to continue handling the necessary paperwork for both estates and serve as executor for both as well. However, the week my father passed, my brother and I met with the then attorney for the estates, Merle F. Maffei, Esquire, and during that meeting we came to an agreement. Mr. Maffei suggested it might be inconvenient for me to serve as executor of both estates because I had, since 1978, lived in Kentucky, so I was not always able to sign documents right away and needed to make travel arrangements to attend court hearings.

DocuSign Envelope ID: 0BF1588D-AC8D-4E45-ACD4-0CA0511ACCD4

During the meeting, my brother expressed interest in serving as executor because in his words he, "wanted to sign his name to some documents." In other words, he wanted to be involved and Mr. Maffei thought this made sense because my brother lived in Maryland. I agreed. We continued our discussion at that meeting and my brother and I further agreed I would continue to perform work for my father's estate, including preparing the taxes and Orphans' Court filings, and he would be the signatory. We also agreed that we would be responsible for an equal share of the estate expenses. And to the extent I paid more than my share, he personally agreed to repay me from his inheritance when the final distributions were made from the estates. I formally renounced my appointment as executor on or about December 8, 1989. My brother was formally appointed as the executor of my father's estate on December 14, 1989.

8. Because I was doing all of the estate administration work in both estates, I maintained detailed records of all expenses I incurred, including my brother's individual share. My brother actively requested me to pay many expenses and would send me the invoices and bills to pay. I would then tell him when I did so, and I would send him records and proof of the payments. These expenses were also listed in the estate tax returns and Sylmac Inc.'s tax returns and my brother personally reviewed and approved these returns and never objected to the expenses. My brother was aware at all times what his share of the expenses were that I was paying.

9. Even during my parents' lifetime, the Twin Hills project had bred litigation and by early 1991, numerous lawsuits had been filed against the estates, Sylmac, Inc., my brother and I, and the attorneys for the estates, all related to the Twin Hills project. Sylmac, Inc. sought Chapter 11 bankruptcy protection on January 15, 1991 so that we could continue the development project.

10. As a result of the lawsuits against my brother, myself, the estates and the estate attorneys, we had to find new attorneys to represent us, the estates, and Sylmac, Inc., in connection

DocuSign Envelope ID: 0BF1588D-AC8D-4E45-ACD4-0CA0511ACCD4

with the litigation. *Id*. In early May 1991, my brother and I decided to hire attorney Carl J. Tenner, Esquire, to represent us, the estates, and Sylmac, Inc., in the litigation. During a meeting in Mr. Tenner's office in late May 1991, my brother and I agreed, orally, that I would assist Mr. Tenner with research, proof reading and drafting of certain documents in connection with the ongoing litigation. *Id*. I had graduated from law school and was then a member of the Kentucky Bar, so I could assist Mr. Tenner with certain tasks, which would also help keep the expenses down, which my brother would otherwise have to pay part of. My brother and I agreed that I would be entitled to payment for my time at the rate of $40.00 per hour, plus travel and expenses, and that this would be an expense of the estates, which like the other expense, my brother agreed to personally repay me for from his share of the inheritance once final distributions were made from the estates. The rate of $40.00 per hour was selected because this was the rate charged by Mr. Tenner for the work of his paralegal staff. My brother agreed to the rate.

11. I kept meticulous records of work I did for Mr. Tenner in connection with the litigation and also any expenses which I paid. I used a spreadsheet to record the date of the work, a description, and the total time spent. I prepared documents which had to be filed in the estate of the Parties' father, prepared tax returns for the estate, estate accountings, and other documents and did legal research and drafting to reduce the litigation costs in the lawsuits the Parties and Sylmac Inc. My brother was aware of the work I was doing because I sent him my work product, and told him about the specific work I did and the time spent. He was also involved in the litigation and had first-hand knowledge of what was being done by virtue of his involvement and attendance at Court hearings or meetings with the attorneys.

12. My brother received a tremendous benefit by virtue of my having paid his share of the estate expenses for my father's estate, and also for the work I did for Mr. Tenner. Had I not

paid the expenses, he would have needed to find the money to pay them and he did not have it. Because I was paying everything, he was able to save money and also to spend his money investing for personal gain, funding his business, and traveling to Africa, and Costa Rica and other countries for leisure. He also did not have to pay a lawyer or accountant to do the work I was doing on behalf of the estate.

13. In early 1990, my brother asked if I would agree to let him take out a loan against the Homestead Lot, so he could use the money for an investment. I agreed. But since the loan was only for his benefit, not mine, it would only be in his name, and he would be solely responsible for making payments. But to get the loan in his name only, I needed to deed my co-tenant interest to him temporarily and he would then agree to transfer my interest back to me after obtaining the loan. Otherwise, the bank would not give him the loan unless I cosigned.

14. On May 23, 1990, my brother and I entered into a written agreement wherein I agreed to convey my one-half interest in the Homestead Lot to him, temporarily, so he can obtain a loan in the amount of approximately $136,500.00. The loan was secured by the Homestead Lot. My brother, after obtaining the loan, reconveyed my interest back to me. In the contract, my brother agreed to repay any remaining mortgage once he received his share of the inheritance from our parent's estates.

15. My brother fell behind on the monthly mortgage payments almost immediately and, at his request, I loaned him money for the payments to avoid foreclosure. Initially, as repayment, my brother assigned me his claims in Sylmac Inc.'s bankruptcy case totaling $34,607.72. But my payments exceeding this amount. So, after that, my brother agreed to repay me personally, from his inheritance, for all of the money I loaned him towards the mortgage.

16. On or about July 23, 1993, to memorialize our agreement regarding repayment of the amounts loaned for the mortgage, including those then outstanding as well as future amounts paid by me, my brother and I entered into a second contract. In the contract, he agreed to repay all of the money I loaned him, including future sums, for the mortgage, when inheritance funds were available from the estates.

17. After July 1993, I continued to loan Defendant money for the mortgage payments on a monthly basis. In addition to the monthly payments, on January 5, 2008, I made a lump sum payment of $105,067.73, to pay off the remaining balance of the mortgage. Even after the mortgage was paid off, my brother would ask me to pay his share of the property taxes and insurance for the Homestead Lot. I estimate in total, since May 1990, I have paid in excess of $411,000.00, towards the mortgage and towards my brother's share of the property taxes and insurance for the Homestead Lot. In the three years prior to the filing of this case, I made the following payments on my brother's behalf for the property taxes and insurance:

   a. Jan. 11, 2016          $513.71 Homeowner's Insurance Homestead Lot
   b. Sept. 23, 2016         $1,456.90 Property Taxes on Homestead Lot
   c. Jan. 13, 2017          $548.28 Homeowner's Insurance Homestead Lot
   d. Sept. 25, 2017         $1,518.62 Property Taxes on Homestead Lot
   e. Jan. 10, 2018          $583.34 Homeowner's Insurance Homestead Lot
   f. Sept. 25, 2018         $1,531.56 Property Taxes on Homestead Lot
   g. TOTAL                  $6,152.41

Additional payments were made since the lawsuit as well on his behalf that I have not been repaid for. My brother has, within the three years prior to the filing of this lawsuit, made nominal payments to me towards the outstanding balance of property taxes and homeowner's insurance I

have paid on his behalf since 1990. Specifically, he made the following payments since October 2016 to the date of the filing of the lawsuit:

      a. Oct. 6, 2016          $1,456.91 Cashier's Check from Defendant

      b. Nov. 17, 2017        $235.00 Cashier's Check from Defendant

      c. May 6, 2018         $1,563.00 Cashier's Check from Defendant

18. By 2000, 30 of the 31 lots were sold. Unfortunately, all of the proceeds from the sale were used to pay Sylmac Inc.'s creditors as required by Sylmac Inc's Chapter 11 Plan of reorganization. Only one lot remained in addition to the Homestead Lot – Lot 27 – and it was transferred to the estates, with each estate holding a 50% interest.

19. Lot 27 had not been sold by 2015. However, that year the Orphans' Court ordered its sale and instructed my brother to close my father's estate, I expected that the estates would finally be closed and final distributions paid, and that at that time, my brother would finally repay me pursuant to our written and oral agreements, from his inheritance. However, we struggled to find a buyer for Lot 27 for two years and it was still not sold by early 2017.

20. Until 2017, my brother had done nothing inconsistent with our oral and written contracts. He never told me he was not planning to repay me, and I had no reason to think he was not intending to pay. Neither of the estates had closed and Lot 27 had not been sold by then, so his obligation to repay me had not been triggered. Lot 27 was finally sold in June 2017 and the net proceed split between the estates.

21. Then, on August 14, 2017, rather than close the estate and pay over his inheritance to me, my brother filed a petition in our father's estate seeking personal representative commissions of $43,784.43. I opposed the request because, if granted, his remaining inheritance

7

(after netting out the commissions and other expenses) would not cover the debt he owed me under our oral and written contracts.

22. At that time, my brother owed me approximately $61,800.17 in connection with expenses I had paid and work I had done at the rate of $40.00 per hour. Of this amount, $17,178.00 was for work I had performed for the estates in connection with the litigation, at the agreed upon rate of $40.00 per hour. $1,040.00 was for my travel time to attend hearings in Maryland also in connection with the estate litigation. And $43,582.17 was for expenses I had advanced on my brother's behalf for my father's estate and also Sylmac Inc. Defendant owed me these amounts pursuant to our 1989 and 1991 oral agreements.

23. On October 30, 2017, I filed a claim against my father's estate to try and recover some of the expenses I had advanced on my brother's behalf as administrative expenses chargeable to the estate. This was not a claim against my brother individually, and the Orphans' Court did not decide the issue of my brother's individual liability for this debt.

24. On October 31, 2017, during a hearing before the Orphans' Court on several different filings in my father's estate, including my brother's request for personal representative's commissions, my objections thereto, and my claim for administrative expenses, my brother disclaimed for the first time that he ever had an agreement with me to repay me for work I did in connection with the estate litigation at $40.00 per hour, thus breaching our prior oral contracts. He also testified that I agreed to mortgage the Homestead Lot in 1990 so that we could use the money to invest in his business venture to purchase diamonds from Africa and that we both understood the money, or business profits, would be used to pay estate expenses and attorneys' fees. This statement was absolutely false and mischaracterized the purpose of the mortgage, which was solely for my brother's benefit. I never agreed that by allowing him to take out the mortgage, that I would

8

be investing in any business of his and I expected to be paid back for the amounts I loaned him pursuant to our written agreement executed in 1993. My brother's statements at the October 31, 2017 hearing suggested he had no intention of honoring that 1993 written agreement. This was confirmed months later when my brother refused to comply with the Orphans' Court's December 14, 2017, order directing him to close my father's estate, account for my claim of expenses as allowed by the Orphans' Court in the amount of $41,759.74, and distribute the residue in the estate as inheritance to he and I no later than March 14, 2018. I considered the written 1993 agreement breached at that point and filed this lawsuit several months later in October 2018. I have not received any of expenses I was awarded from my father's estate.

25. In 1989, after my father passed away, the Homestead Lot was still in good condition. My parents had kept up with the maintenance of the family home and the outbuildings. There was no damage to the heating system, or septic system and all were in good working order. I am not aware that any repairs were needed then.

26. My brother and his family (wife and three kids) have lived on the Homestead Lot since my parents passed away. They occupy the entire family home. During the period 1989 to 2002, My family and I would visit Maryland from Kentucky, sometimes multiple times a year, and we would stay in a separate apartment located in one of the numerous detached buildings on the Homestead Lot. The apartment was on the second floor of the building and was only accessible using a wooden staircase which led to a wooden landing where the entry was. I kept my personal belongings in the apartment and furnished it with my own money. There was a lock on the door and both my brother and I had a key. In or around 2002, my brother removed my possessions from the apartment and then rented it to several individuals who I did not know. After they took possession of the apartment, I could not use the apartment or access it freely. I have no knowledge

regarding the history of what my brother refers to as the tractor shed that contained the detached apartment referenced in my complaint before it came into my family's possession. I also disagree that the improvements done to the apartment were not in compliance with municipal code or that the unit cannot be rented. No such determination has ever been made by Anne Arundel County and the improvements were done over the course of decades during which time housing codes changed multiple times. The structure in which the apartment is located is in such a state of disrepair as a result of my brother's failure to maintain it, that it cannot be used for any purpose and must be torn down because it is unsafe and not structurally sound. The apartment had a roof leak which allowed water to enter the structure and cause water damage which was never repaired. I also do not believe that the roof was ever repaired.

27. My brother also restricted my access to the family home after our parents passed away. He and his family were living on the Homestead Lot so I could not visit without calling my brother, or his wife, first and notifying them of when I would be stopping by. I was also not able or permitted to enter the family home without my brother or someone from his family present. There were times after I could no longer use the apartment, when I would stay overnight in the family home, but during these visits my brother controlled which areas of the home I saw and had access to. As our relationship worsened, I was rarely able to visit the property. My last time inside the family home was in or around August 2018.

28. In or around 2009, my brother removed the wooden stairs to the apartment. Without the stairs, it was impossible for me to safely access the apartment. He has never replaced them.

29. Because my brother prevented me from accessing certain parts of the Homestead Lot, such as the attic, basement and second floor detached apartment, I had no way of knowing or discovering the nature and extent of the damage caused by my brother's neglect and failure to

perform basic maintenance to integral systems such as the heating and sewer system. I would not have discovered that the heating systems were not working on my visits because I visited in the summer months when the heat would not be on.

30. Until 2018, my brother never told me that there were maintenance issues with the Homestead Lot or that he had deferred or failed to perform necessary repairs. In August 2018, during a visit to the Homestead Lot, my brother told me for the first time that there was a broken septic line on the property. The site was downhill from the house on the other side of the apartment. He had excavated the area to try and find the break. In late October, my brother revealed that the septic issue was more serious than it appeared and that it would need to be repaired at significant cost before the Homestead Lot could be sold. I then became suspicious that there were other significant problems which my brother was hiding from me.

31. After this lawsuit was filed, I had two appraisals done of the Homestead Lot by a certified appraiser. Each appraiser performed an onsite inspection. Based on the reports, I confirmed there was damage to the Homestead Lot which needed to be repaired. Notably, the well pipes were damaged, the furnace was not working, and had not worked in several years, the outbuildings on the property needed to be demolished due to disrepair, there was water damage in the basement, settling in the sunroom, and the radiant baseboard heating system was inoperative and had been for some time. The damage was in areas of the home which I did not have access to, and or would not have recognized as a problem, even if I did see it, because I have no specialized knowledge in construction or home remodeling and these problems would only be apparent to a trained eye.

32. In or around September 21, 2016, my brother hired a company called Terrain Inc., to petition the Anne Arundel County Office of Zoning and Planning for a density variance which

11

DocuSign Envelope ID: 0BF1588D-AC8D-4E45-ACD4-0CA0511ACCD4

would allow the Homestead Lot to be divided into two separate parcels. I do not approve of the subdivision because it will not result in an equal division of the Homestead Lot and my brother has continued to work towards subdividing the Homestead Lot without my permission, involvement or agreement.

33. My brother's goal in seeking to divide the Homestead Lot was give me the smaller undeveloped parcel and for him to keep the larger parcel and to continue to live in the family home. I have never agreed to this.

34. My brother, with the help of Terrain Inc., proposed subdividing the Homestead Lot, referred to as Lot 28R, into two lots, Lot 28R-A, consisting of 2.6 acres and containing the family home, and Lot 28R-B, containing 1.7 acres of undeveloped land.

35. I disagree that the Homestead Lot should be subdivided in the manner proposed by Defendant, or any other manner, because the two hypothetical parcels that would result from the subdivision (Lot 28R-A and Lot 28R-B) are not equivalent in terms of size and market value. There is no way to partition the Homestead Lot equally because the family home can be situated on only one parcel and it would always have a greater market value than the undeveloped parcel. And obviously there is no way to equally divide the home itself without destroying it.

36. I have obtained two appraisals of the Homestead Lot, with each appraiser providing a comparative value for: (1) the Homestead Lot in its entirety; (2) hypothetical Lot 28R-A; and (3) hypothetical Lot 28R-B. An appraisal performed in February 2020, estimated the value of the entire Homestead Lot as $439,000.00, the value of Lot 28R-A at $323,000.00, and the value of Lot 28R-B at $145,000.00. A second appraisal performed in February 2021 puts the market value of the entire Homestead Lot at $460,000.00, and the hypothetical values of Lot 28R-A at $410,000.00 and Lot 28R-B at $136,000.00, respectively.

I, Elizabeth McMillan-McCartney, on this 17th day of December, 2021, do hereby affirm under the penalty of perjury that the foregoing is accurate and true to the best of my knowledge and belief.

12/17/2021
Date

*Elizabeth McMillan-McCartney*
Elizabeth McMillan-McCartney