UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ELIZABETH McMILLAN-McCARTNEY<br><br>    Plaintiff<br>v.<br><br>CALDWELL McMILLAN, JR.<br><br>    Defendant | Case No.:<br>**18-cv-03331-CBD** |

## DEFENDANT'S SUMMARY JUDGMENT REPLY AND OPPOSITION

Caldwell McMillan, Jr., by and through counsel, files this reply in support of his motion for summary judgment (ECF 82) and in opposition to the Plaintiff's counter-motion (ECF 86).

## STATEMENT OF FACTS

While Ms. McCartney disputes some of Mr. McMillan's facts, and asserts some new facts which he may dispute, these factual disputes do not alter the material facts on the issues framed herein. Additionally, herein he repeats some facts asserted by Ms. McCartney solely for the purposes of his summary judgment motion, as the motion requires the facts be viewed in the light most favorable to Ms. McCartney.

## ARGUMENT IN REPLY
### (Defendant's Motion for Summary Judgment)

**Count 4 – Contribution**

Ms. McCartney concedes Mr. McMillan's argument that she may not obtain a money judgment for any payment or debt on which she seeks contribution where she made a payment prior to October 28, 2015. ("Plaintiff agrees that she is not entitled to a money judgment against Defendant individually based on a theory of contribution as to any payments she made on his behalf outside the 3-year limitations period." Pl. Opp. at 17.) Summary judgment should be entered in favor of Mr. McMillan on this issue.

**Count 5 — Equitable Lien**

Mr. McMillan agrees that a court may award an equitable lien on a contribution claim by one co-tenant against another. *Hogan v. McMahon*, 115 Md. 195, 202-03, 80 A. 695, 698 (1911). But that does not mean it exists as an independent cause of action; rather, it is a potential remedy. *See, e.g, J.J. Crewe & Son, Inc. v. Talbot*, 2012 U.S. Dist. LEXIS 77063, at *22-24 (D. Md. June 1, 2012) ("[A]lthough plaintiffs have separated their Complaint into two 'counts' (one for a constructive trust or equitable lien, the other for unjust enrichment), the Complaint is perhaps better understood as asserting a single cause of action for unjust enrichment, with two requests for relief …"); *Kenneally v. Bank of N.S.*, 711 F. Supp. 2d 1174, 1191 (S.D. Cal. 2010) ("Plaintiff … does not assert an unjust enrichment claim, and he has provided no authority that either constructive trust or equitable lien constitute an independent cause of action[.]"); *Tara Prods. v. Hollywood Gadgets, Inc.*, No. 09-CV-61436, 2010 U.S. Dist. LEXIS 37889, at *29-30 (S.D. Fla. Apr. 16, 2010) ("[A]n equitable lien is a remedy in connection with Plaintiff's claims for unjust enrichment and quasi-contract — not a separate cause of action.").[1]

---

[1] In *Hogan*, the court noted that an equitable lien is a remedy only between the tenants and cannot prejudice the rights of third parties (who may have acted with regard to the property without any knowledge of the hidden, equitable lien between the co-tenants and therefore should not be prejudiced by it).
It is not clear what benefit an equitable lien offers a litigant who, upon

Equitable subrogation, which Ms. McCartney also touches upon, is a different concept. Equitable subrogation may arise where a lender pays off an earlier-recorded lien ("Lien # 1") and there are liens recorded ("Lien # 2") after the original lien but before the refinancing lien ("Lien # 3"). Under equitable subrogation, the refinancer (Lien # 3) takes the priority position of the lien that they paid off (Lien # 1). *G.E. Capital Mortg. Servs. v. Levenson*, 338 Md. 227, 657 A.2d 1170 (1995). If Ms. McCartney claims a lien and is jockeying for position among other lienholders, she needs do it against the other lienholders, not Mr. McMillan.

Count 5 should be dismissed; Ms. McCartney will still be allowed to pursue an equitable lien as part of any other appropriate cause of action in the Complaint.

**Count 6 — Waste**

Ms. McCartney contends for the first time that the count for waste is about more than the outbuilding/apartment. However, no such allegation is in the complaint, which only refers to waste of the "apartment." (Compl. ¶ 25.)

Regarding the apartment, Ms. McCartney argues that her claims are not

---

getting a money judgment, can immediately file it in a county circuit court and it will then exist as a lien against any real property in the county, not just the property that is the subject matter of the litigation.

beyond the statute of limitations because, following the removal of stairs to the apartment in 2009, she could not get inside. (Pl. Opp. at 33; McCartney Aff. ¶ 28.) First, Ms. McCartney could have used a ladder for inspection purposes, by herself or using a contractor:



(From appraisal at ECF 86-7 p. 24.)

Additionally, that the entryway stairs were missing would put a reasonable person on notice of the building's dilapidated condition and that continuing regular maintenance was likely not occurring. "[T]he statute of limitations will begin to run when the plaintiff has knowledge of circumstances which would cause a reasonable person in the position of the plaintiff to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged tort." *Lumsden v. Design Tech Builders*, Inc., 358 Md. 435, 446, 749 A.2d 796, 802 (2000) (cleaned up) (citation omitted). There was

sufficient opportunity for Ms. McCartney to inquire into the condition of the apartment, contribute to its maintenance for which she was equally responsible, and sue within three years if she was in some way obstructed from fulfilling her own responsibilities.

The allegations regarding the main residence are new and not included in the complaint.[2] To the extent they are considered, Ms. McCartney has not alleged waste. Neglect does not constitute waste unless it leads to the permanent reduction in value. "Waste may be committed by acts or omissions which tend to the lasting destruction, deterioration, or material alteration of the freehold and the improvements thereto or which diminish the permanent value of the inheritance." Am. Jur. 2d Waste § 1 (quoted in *Hundt v. Snedegar*, 2015 Md. App. LEXIS 1090, at *36 (2015) (unpublished)); *see also, Boucher Invs., Ltd. P'ship v. Annapolis-West*, 141 Md. App. 1, 18, 784 A.2d 39, 49 (2001) (voluntary versus permissive waste). Mr. McMillan was not required to engage in major renovations unless failing to do so would result in permanent damage (*e.g.*, a hole in a roof that leads to wider water damage).[3] None of Ms. McCartney's allegations regarding the main residence obligated Mr. McMillan to fix them.

---

[2]  In her declaration Ms. McCartney claims she only learned of the damage when she obtained a post-complaint appraisal. (McCartney Aff. ¶ 31.)

[3]  And even then, only if Ms. McCartney did not have knowledge or inquiry notice such that she was equally responsible for repairs.

One allegation is of a broken septic line. But Ms. McCartney describes in her affidavit that, while she was doing nothing for the property, Mr. McMillan was busy having the lot excavated to try to find a break in the septic line and discovered a major problem, which he disclosed to Ms. McCartney. (McCartney Aff. ¶ 30.) For some reason Ms. McCartney, a co-owner, believed she could just continue to let Mr. McMillan do the work and she had to do nothing except sue. Another allegation is of a broken furnace. (McCartney Aff. ¶ 31.) But unless that (1) has caused secondary, permanent issues (possible in some situations but not alleged here), and (2) he kept Ms. McCartney from knowing about the problem or fixing the problem, it is not Mr. McMillan's sole job to replace an aged HVAC system.

Regarding the apartment, if Ms. McCartney has established waste, she was on inquiry notice in 2009 but did not file the complaint until 2018. Regarding the residence, to the extent Ms. McCartney is permitted to insert these new allegations (opposed), she has not established that (1) the responsibility is Mr. McMillan's alone, or (2) that the failure to upgrade, repair, and renovate has caused lasting secondary damage.

**Count 8 — Breach of Oral Contract**

Ms. McCartney states that on the oral contract claim, Mr. McMillian only disputes $19,400.03. Nowhere does that appear in Mr. McMillan's motion. The orphans' court claim stands as follows:

|  | Claimed | Allowed | Disallowed |
| --- | --- | --- | --- |
| Time | $17,178.00 | 0 | $ 17,178.00 |
| Travel | $ 1,040.00 | 0 | $ 1,040.00 |
| Expenses | $43,582.17 | $41,759.74 | $ 1,822.43 |
| Total | $61,800.17 | $41,759.74 | $20,040.43 |

Regarding the $41,759.74 allowed, to the extent Ms. McCartney pursues it here, she cannot be double-paid. If she alleges she has not been paid, she has not established it. As Ms. McCartney states, the Estate is not yet closed and so her claim for payment it not ripe; or if it is, she has not asserted facts establishing how and why she is owed that amount from Mr. McMillan not the Estate.

Regarding the disallowed amount, Mr. McMillan argues that collateral estoppel bars payment and that the statute of frauds applies.

The scope of the orphans' court ruling is broader than Ms. McCartney claims. The orphans' court found that "both parties … have contributed a substantial amount of time and expense over a long period of time as brother and sister to administer the estates of their parents." The orphans' court reasoned that the parties so acted for mutual benefit: "neither party shall be compensated for their effort, time, travel, etc. as the remaining assets of the estate shall be split

equally after all legitimate expenses of estate administration are paid."

Ms. McCartney argues that this Court's decision on a motion to dismiss collaterally estops Mr. McMillan from challenging the claim on summary judgment. The ruling on a motion to dismiss, in addition to being subject to different legal standard than a motion for summary judgment, is an interlocutory order not a final judgment, so the concept of collateral estoppel does not apply. "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment. This is because a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) (citation omitted).[4]

---

[4] However, the orphans' court order denying Ms. McCartney's fees and expenses (in part) was a final, appealable order, despite the Estate remaining open, and therefore has collateral effect. Due to the nature of estate proceedings, a wide range of seemingly interlocutory orders, including allowance and denial of claims, are final, appealable judgments. As explained in a treatise by Judge Arthur of the Court of Special Appeals:

> Because of the intermittent and *ad hoc* nature of orphans' court litigation, it typically does not result in the same kind of conclusive final judgment that civil litigation typically generates. ... Indeed, to the extent that an orphans' court's seemingly interlocutory orders might authorize the distribution of assets from the estate (e.g., through payments to professionals or creditors or through gifts to discrete beneficiaries) the orders would be unreviewable if an aggrieved party were required to wait for months or even years after the distribution, when the estate was

Ms. McCartney attempts to distinguish the orphans' court claim from this claim because the orphans' court claim was against the Estate and this claim is against Mr. McMillan. Ms. McCartney's affidavit shows this to be a fiction. She states that she and her brother hired an attorney to assist with estate-related litigation, that she agreed to assist the attorney, and that Ms. McCartney's time would be billed at $40.00 which "would be an expense of the estates." (McCartney Aff. ¶ 10.) While she adds that "my brother agreed to personally repay me," that does not change the orphans' court final decision, which Ms. McCartney did not appeal, that in the 26 years between that alleged 1991 oral agreement and the 2017 decision, both parties expended relatively equal amounts of time on the Estate such that the orphans' court determined, after testimony and evidence, that "neither party shall be compensated for their effort, time, travel. etc."

Ms. McCartney now calls it a breach of contract action outside the jurisdiction of the orphan's court. That is not how she petitioned the orphan's court, however, in which she stated that she sought compensation for "services

---

finally closed, before he or she could appeal: in those circumstances, the assets would most likely be long gone before an appellate court could act to correct any alleged error.

*Finality of Judgments and Other Appellate Trigger Issues § 63* (3d. ed. 2018), Kevin F. Arthur, Judge, Court of Special Appeals of Maryland.

such as paralegal, accounting, and real estate work *on behalf of the Estate*." (ECF 22-2 ¶ 6 (emphasis added).) She did not do the work on behalf of Mr. McMillan.[5]

Ms. McCartney suggests that an alleged (and disputed) 1989 oral agreement, before Mr. McMillan was appointed personal representative, establishes that Mr. McMillan thought of it as a personal liability. (Pl. Mem. at 27.) But it is entirely reasonable that siblings would agree, before a formal appointment of a personal representative, that one of them would be reimbursed from the anticipated estate.[6]

Regarding the statute of frauds, the origin of the rule relates to collateral debts. The Fourth Circuit, analyzing a similar North Carolina statute, quoted a decision there: "'Whether a promise is an original one not coming within the statute of frauds, or a collateral one required by the statute to be in writing, is to be determined from the circumstances of its making, the situation of the parties,

---

[5] Ms. McCartney claims that the $40/hour was used because that was the rate for the hired attorney's paralegals. The alleged agreement does not make sense because being paid from the Estate and being paid from Mr. McMillan's pocket are not equal. For instance, one hour of her time taken from $100 of the estate gives Ms. McCartney $70 and Mr. McMillan $30. Paying post-distribution gives Ms. McCartney $90 and Mr. McMillan $10.

[6] "When done in good faith, the personal representative's acts occurring before appointment have the same effect as those occurring after." Ann. Code of Md., Est. & Trusts § 6-105(a). "The relation back doctrine [for actions by a personal representative] enjoys virtually unanimous application throughout the fifty states, and dates back, by some accounts, more than 500 years." *Richard v. Richard*, 193 So. 3d 964, 969 (Fla. Dist. Ct. App. 2016).

and the objects sought to be accomplished.'" *Goldsmith v. Erwin*, 183 F.2d 432, 434-35 (4th Cir. 1950) (quoting *Farmers Fed'n, Inc. v. Morris*, 223 N.C. 467, 468, 27 S.E.2d 80, 81 (1943)). The *Farmers* court provided the following example from a treatise on contracts:

> If, for instance, two persons come into a store and one buys and the other, to gain him credit, promises the seller, 'If he does not pay you, I will,' this is a collateral undertaking and must be in writing; but if he says, 'Let him have the goods and I will pay,' or 'I will see you paid,' and credit is given to him alone, he is himself the buyer, and the undertaking is original.

*Farmers Fed'n, Inc. v. Morris*, 223 N.C. 467, 468, 27 S.E.2d 80, 81 (1943) (quoting treatise).

So the question here is whether Mr. McMillan is alleged to have agreed to be a promisor or a guarantor? According to Ms. McCartney, he was the latter: "My brother and I agreed that I would be entitled to payment for my time at the rate of $40.00 per hour, plus travel and expenses, *and that this would be an expense of the estates*, which like the other expense, my brother agreed to personally repay." (McCartney Aff. ¶ 10 (emphasis added).) Consistent with that, Ms. McCartney, under oath, first petitioned to have the money paid from the Estate, in which she sought "reimbursement and expenses for compensation for services rendered to the estate." (ECF 82-2.)

This is consistent with the cases cited by Ms. McCartney. For instance,

in *Brown v. Quinton*, 86 Kan. 658, 666, 122 P. 116, 119 (1912), the court stated that "a promise to be within the statute [of frauds] must be in a sense collateral." In that case, the personal representative hired and promised to pay the attorney; it was not a collateral promise or debt, as here.

The alleged debt is barred by collateral estoppel and the statute of frauds.

**Count 9 — Unjust Enrichment**

In arguing that her unjust enrichment claim is not barred by the statute of limitations, Ms. McCartney combines the theory of unjust enrichment with the existence of an alleged contract. That is, that (1) Mr. McMillan was unjustly enriched and (2) there was an agreement to defer payment until the assets were distributed from the Estate. She argues, "the unjust enrichment claim accrued no earlier than October 2017 and March 2018, when the Defendant breached the Parties' oral and written agreement …"; "prior to the breach, Defendant had not been unjustly enriched." (Pl. Mem. at 30.) But where there is a contract, unjust enrichment it not an available remedy. "When an express contract is present, the plaintiff cannot recover under a theory of unjust enrichment." *Froelich v. Erickson*, 96 F. Supp. 2d 507, 524 (D. Md. 2000).

The unjust enrichment claim may be an alternative to the breach of contract claim should the Court find there was no contract. But if no contract

existed, the unjust enrichment claim does not get the benefit of a thus nonexistent contractual agreement to defer accrual of the statute of limitations until the assets of the Estate were distributed. Rather, as asserted in the Complaint, Mr. McMillan was unjustly enriched dating back to 1990, as Mr. McMillan failed to pay his share of expenses. (Compl. ¶¶ 57-59.) Any unjust enrichment that accrued prior to October 28, 2015 is time barred.

### Count 10 — *Quantum Meruit*

As she does on the unjust enrichment claim, Ms. McCartney supports it with an alleged contract claim:

> Viewing the facts in the light most favorable to Plaintiff, the Court can conclude that Defendant and Plaintiff entered into an oral agreement for Plaintiff to render services to Defendant and that Defendant benefitted as a result of those services.
> (Pl. Mem. at 31.)

> [The statute of limitations] argument fails because this claim is based on, and arises from, the Defendant's breach of the Parties' oral contract.
> (Pl. Mem. at 32.)

Like the unjust enrichment claim, the *quantum meruit* claim and the contract claim are mutually exclusive. "When there is an express contract dealing specifically with the services rendered, *quantum meruit* is unavailable"; "[t]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the

quasi-contractual claim rests." *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 776, 471 A.2d 1121, 1126 (1984) (quoting cases, omitted).

The oral contract is based upon Mr. McMillan's alleged promise to personally pay Ms. McCartney for services she provided to the Estate. If Ms. McCartney is proceeding on the *quantum meruit* claim, that means her contract claim failed and does not exist to support a claim against Mr. McMillan personally.

Additionally, the *quantum meruit* claim does not enjoy the same statute of limitations deferral of a nonexistent contract. She provided services no later than 2014 (most prior to 1996) and sued in 2018.

The *quantum meruit* claim (1) cannot be applied against Mr. McMillan personally and (2) is time barred.

**Count 11 — Ouster**

Regarding the outbuilding, Ms. McCartney alleges she was ousted in 2002: "In or around 2002, my brother removed my possessions from the apartment and then rented it to several individuals who I did not know. After they took possession of the apartment, I could not use the apartment or access it freely." (McCartney Aff. ¶ 26.)[7]

---

[7]   In the Complaint she put it earlier, in 1998. (Compl. ¶ 66-70.)

In the Complaint, the count for ouster relates only to the outbuilding. (Compl. ¶¶ 24, 66-70.) To the extent she can now claim ouster from the residence (opposed), Ms. McCartney alleges accrual even sooner: shortly after their parents passed away in 1989. (McCartney Aff. ¶ 27.) While she claims she was last physically inside the home in 2018, she describes never having free use; rather she was only allowed when Mr. McMillan or a family member was present and her access was severely limited. (*Id.*) "[A]ny act or conduct [by a co-tenant] signifying his intention to hold, occupy and enjoy the premises exclusively, and of which the tenant out of possession has knowledge, or of which he has sufficient information to put him upon inquiry, amounts to an ouster of such a co-tenant.'" *White v. Pines Cmty. Improvement Ass'n*, 403 Md. 13, 35, 939 A.2d 165, 178 (2008) (quoting *Sowers v. Keedy*, 135 Md. 448, 451, 109 A. 143, 144 (1919)). Ms. McCartney alleges many such qualifying acts starting immediately after their parents passed away:

> My brother also restricted my access to the family home after our parents passed away [in 1989]. He and his family were living on the Homestead Lot so I could not visit without calling my [Mr. McMillan], or his wife, first and notifying them of when I would be stopping by. I was also not able or permitted to enter the family home without my brother or someone from his family present. There were times after I could no longer use the apartment, when I would stay overnight in the family home, but during these visits my brother controlled which areas of the home I saw and had access to. As our relationship worsened, I was rarely able to visit the property.

(McCartney Aff. ¶ 27.)

According to Ms. McCartney, she has been allowed access to the residence only as a visitor or guest for thirty years, not an occupant or tenant.

To the extent that Ms. McCartney suggests there is vagueness as to when these actions occurred, that argument won at the motion to dismiss stage. *McMillan-McCartney v. McMillan*, 2019 U.S. Dist. LEXIS 102236, at *40-41 (D. Md. June 19, 2019). But now Mr. McMillan has asserted by affidavit that any ouster occurred prior to October 28, 2015. (McMillan Aff. ¶ 20.) Ms. McCartney cannot continue to play the game of keeping it vague to avoid the statute of limitations. On summary judgment, "the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment." *Gary v. USAA Life Ins. Co.*, 229 F. Supp. 3d 365, 369 (D. Md. 2017).

Ms. McCartney's claim for ouster is time barred. At a minimum, her claim is time barred as to any alleged rental profits of the apartment building (which is all that is claimed in the Complaint) prior to October 28, 2015. *See, e.g., Tongue v. Nutwell*, 31 Md. 302, 315 (1869) ("As to limitations as a bar to mesne profits, the defendant may plead it after three years.")[8]

---

[8] "*Mesne* profits are the rents and profits, or the value of the use and occupation of the real property recovered in an action of ejectment during the period the property has been wrongfully withheld. These profits consist of the

**ARGUMENT IN OPPOSITION TO PLAINTIFF'S MOTION**

A jointly-owned property may be sold, not partitioned, "[i]f it appears that the property cannot be divided without loss or injury to the parties interested." Ann. Code of Md., Real Prop. § 14-107(a). The party seeking sale in lieu of partition has the burden of proof. *Boyd v. Boyd*, 32 Md. App. 411, 419, 361 A.2d 146, 151 (1976).

Ms. McCartney claims the Homestead lot of 4.3 acres cannot be divided based on one configuration presented: a 2.6 acre lot that includes the residence, and a 1.7 acre undeveloped lot. In this configuration, one lot is not only larger, it also has a residence on it. Ms. McCartney adds that because there is a (small, dilapidated) residence involved, the lot cannot be subdivided because one lot will have the residence and one will not. However, the lots could be configured in such a way, whether by size and/or other features, that evens their value. At the very least, Ms. McCartney has not even alleged, much less produced any evidence, that it appears the lot cannot be divided without harm to a party.[9]

---

net rents which the owner might, with reasonable diligence, derive, after deducting all necessary repairs and taxes. It has the same meaning in law as the phrase 'The value of the rents and profits.'" *Van Ruymbeke v. Patapsco Indus. Park*, 261 Md. 470, 488, 276 A.2d 61, 70 (1971) (quoting *Newell on Ejectment* 606 (1892)).

[9]  Per Rule 56(c)(1)(B), "[o]ne party, without citing any other materials, may respond or reply that materials cited to … support a fact do not establish the absence … of a genuine dispute." Notes of Advisory Committee to 2010 Amendments.

## CONCLUSION

For the reasons stated here, summary judgment should be granted for Mr. McMillan on the claims discussed herein, and Ms. McCartney's counter-motion should be denied.

                                        Respectfully submitted,

                                        <u>/s/ Sean R. Day /s/</u>
                                        Sean R. Day (Bar No. 12831)
                                        7474 Greenway Center Dr Ste 150
                                        Greenbelt MD 20770-3524
                                        301.220.2270 phone
                                        301.220.2441 fax
                                        Sean@DayInCourt.Net
                                        Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served this filing date upon all parties through the ECF filing system. All parties are represented by counsel who are registered ECF users and have entered appearances in this case.

                                        <u>/s/ Sean R. Day /s/</u>
                                        Sean R. Day