IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELIZABETH MCMILLAN-MCCARTNEY,  *

Plaintiff,                     *

v.                             *          Civil Action  MJM-18-3331

CALDWELL MCMILLAN, JR.,        *

Defendant.                     *

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Elizabeth McMillan-McCartney commenced this civil action against her brother Defendant Caldwell McMillan, Jr. in connection with disputes regarding residential property owned by the parties as tenants in common and the administration of their deceased parents' estates. The matter is before this Court on diversity jurisdiction pursuant to 28 U.S.C. § 1332.[1] Now pending before the Court is Defendant's Motion for Summary Judgment (ECF 82) and Plaintiff's Cross-Motion for Partial Summary Judgment (ECF 86). The Court has reviewed the record, as well as the pleadings and exhibits, and finds that no hearing is necessary. Loc. R. 105.6. For the reasons stated below, Defendant's motion will be granted in part and denied in part and Plaintiff's cross-motion will be granted.

## I.     Background

Plaintiff and Defendant are siblings whose parents (the "Parents") owned a large tract of undeveloped land in Anne Arundel County, Maryland. The Parents subdivided the tract into individual lots and formed a Maryland corporation called Sylmac, Inc. (hereinafter "Sylmac") in

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 19; ECF 21).

1961 to hold, develop, and market the lots. (E. McMillan-McCartney Decl. ¶ 3). In the 1980s, the Parents began a new subdivision project, "Twins Hills," and Sylmac borrowed considerable sums of money to fund the Twin Hills development. (*Id*.) The parties' mother, Sylvia Ross McMillan, passed away on January 16, 1989, and their father, Caldwell McMillan, Sr., passed away on December 3, 1989. (*Id*. ¶ 1). Both died testate, and Plaintiff and Defendant are the only legatees. (*Id*.) The parties immediately opened estates for each parent in the Orphans' Court for Anne Arundel County, Maryland. (*Id*. ¶ 2). The estates are still open and have not been fully administered. (*Id*.) When the parties' father passed away, there were 31 lots remaining of the original tract of land, plus the lot containing the McMillan family home, identified as 1886 Crownsville Road, Annapolis, Maryland, and also known as Lot 28R (the "Homestead Property"). (*Id*. ¶ 4). Currently, each party owns a 50% interest in the Homestead Property as tenants in common. (*Id*. ¶ 5). The parties also assumed control of Sylmac and operated it with the goal of completing the Twin Hills development project. (*Id*. ¶ 6). They anticipated that once the construction loan and other debts were paid off, the proceeds from the sale of the lots would go to the estates and ultimately be distributed to each party as an inheritance. (*Id*.)

Plaintiff was the personal representative for her mother's estate when her father passed away and was initially named personal representative of her father's estate through his will upon his passing on December 3, 1989. (*Id*. ¶ 7). The following week, during a meeting with Merle F. Maffei, an attorney for the estates, the parties agreed to have Defendant serve as personal representative of the father's estate. (*Id*.) The parties agreed at that meeting, orally, that Plaintiff would continue to prepare the documents necessary to the father's estate, and Defendant would be the signatory. (*Id*.) Plaintiff states in a sworn declaration that the parties also agreed, orally, that they would each be responsible for an equal share of the estate expenses. (*Id*.) To the extent

2

Plaintiff paid more than her share, Defendant personally agreed to repay Plaintiff when the estates were fully administered and he received his share of their parent's inheritance, according to Plaintiff. (*Id*.) On or about December 8, 1989, Plaintiff executed a document renouncing her appointment as personal representative in favor of Defendant. (*Id*.) Defendant was appointed as the personal representative of the parties' father's estate on December 14, 1989. (*Id*.) Plaintiff maintained detailed records of all expenses she incurred, including Defendant's individual share, and kept Defendant apprised of the payments she made. (*Id*. ¶ 8).

By early 1991, numerous lawsuits were pending against the estates, Sylmac, the parties, and the lawyers who had initially represented the estates, in connection with the Twin Hills development project. (*Id*. ¶ 9). Sylmac sought Chapter 11 bankruptcy protection on January 15, 1991. (*Id*.) The parties retained attorney Carl Tenner to represent them, the estates, and Sylmac in the litigation. (*Id*. ¶ 10). Plaintiff states in her declaration that during a meeting in the attorney's office in late May 1991, the parties agreed, orally, that since Plaintiff had graduated law school and was barred in Kentucky, she would assist Mr. Tenner with certain tasks to keep the expenses down. (*Id*.) The parties further agreed that Plaintiff would be reimbursed for her time at the rate of $40.00 per hour, which was the hourly rate that Mr. Tenner charged for his paralegal staff, plus travel and expenses. (*Id*.) This would be an expense of the estates, which, like the other expenses, Defendant agreed to personally repay to Plaintiff from his share of the inheritance once final distributions were made from the estates. (*Id*.) Plaintiff maintained detailed records of work performed for Mr. Tenner in connection with the litigation and any out-of-pocket expenses. She states that Defendant was aware of the services she performed and expenses she paid for the estates. (*Id*. ¶ 11). Defendant maintains in a sworn affidavit that he never agreed to be personally responsible for any debt of his parents' estates. (C. McMillan, Jr. Aff. ¶ 8).

3

On May 23, 1990, the parties entered into a written agreement (ECF 86-3) wherein Plaintiff agreed to temporarily convey her interest in the Homestead Property to Defendant so he could obtain a $132,000 loan secured by the Homestead Property (the "1990 mortgage"). (E. McMillan-McCartney Decl. ¶ 14). After obtaining the 1990 mortgage, Defendant reconveyed Plaintiff's interest in the Homestead Property back to her. (*Id*.) In the written contract between the parties, Defendant agreed to repay any remaining mortgage balance once he received his share of the inheritance from the Parents' estates. (*See* ECF 86-3 ("The parties further agree that the above referenced loan is to be paid in full after the litigation regarding Twin Hills is finalized and money comes into the Estate from the sale of the lots.")). Defendant fell behind on the monthly mortgage payments almost immediately, and, at his request, Plaintiff loaned him money to avoid foreclosure. (*Id*. ¶ 15). Initially, as repayment, Defendant assigned Plaintiff his claims in Sylmac's bankruptcy case totaling $34,607.72. (*Id*.) But Plaintiff's loan to Defendant exceeded this amount, so he agreed to repay her personally from his inheritance for the money she loaned him towards the mortgage. (*Id*.) On or about July 23, 1993, the parties entered into a second written agreement to memorialize terms regarding repayment of the amounts Plaintiff loaned for the 1990 mortgage, including those then outstanding as well as future amounts paid by Plaintiff. (*Id*. ¶ 16). This repayment agreement provides, in part:

> As of July, 1993, [Defendant's] claim [in Sylmac's bankruptcy case] has been fully assigned to [Plaintiff] and they now enter this agreement regarding repayment of the loaned monthly payments in excess of the $34,607.72 claim assigned. With any additional monthly mortgage payments loaned by [Plaintiff] to [Defendant], [Defendant] agrees to repay those loaned amounts out of his inheritance from their parents' Estates at the same time he repays the original 1990 mortgage. Those loaned amounts and the original mortgage are agreed to be repaid as soon as the inheritance funds are available from the Estates.

(ECF 86-4).

4

After July 1993, Plaintiff continued to loan Defendant money for the monthly mortgage payments. (*Id*. ¶ 17). According to Plaintiff, Defendant made sporadic payments totaling about $52,000, with the last $900 payment made on October 10, 2006. (C. McMillan Decl. ¶ 17). Then, on January 5, 2008, Plaintiff paid off the remaining $105,067.73 of the 1990 mortgage balance. (E. McMillan-McCartney Decl. ¶ 17, ECF 86-2). Thereafter, Plaintiff would, at Defendant's request, loan him money to pay his share of the property taxes and insurance on the Homestead Property, according to Plaintiff. (*Id*.)

Plaintiff states that, since 1990, she has paid more than $411,000 towards the 1990 mortgage and towards Defendant's share of the property taxes and insurance for the Homestead Property, and she has not been repaid. (*Id*.) In the three years prior to the filing of the instant lawsuit, Plaintiff paid property tax and insurance totaling $6,152.41 on Defendant's behalf, for 2016, 2017, and 2018. (*Id*.) Plaintiff has also made additional payments on Defendant's behalf since the lawsuit was filed. (*Id*.) Plaintiff states that Defendant made three payments in 2016, 2017, and 2018 totaling $3,254.91 to Plaintiff towards the outstanding balance of property taxes and homeowner's insurance Plaintiff paid on Defendant's behalf since 1990. (*Id*.)

By 2000, 30 lots were sold, and all of the funds were used to pay Sylmac's creditors. (*Id*. ¶ 18). Only one lot, Lot 27, remained aside from the Homestead Property, and it was transferred to the Parents' estates, with each estate holding a 50% interest. (*Id*.) Lot 27 was finally sold in June 2017, and the net proceeds were split between the estates. (*Id*. ¶ 20). On or about August 14, 2017, Defendant filed a petition in his father's estate seeking personal representative commissions of $43,784.43. Plaintiff opposed this request. (*Id*. ¶ 21). On October 30, 2017, Plaintiff filed a claim against the father's estate to recover some of the expenses she had advanced on Defendant's behalf as well as compensation for work she had performed including:

(1)     $17,178.00 for work performed for the estates in connection with the litigation at $40 per hour ("Compensation for Service Performed");

(2)     $1,040.00 for travel time to attend hearings in Maryland, also in connection with the estate litigation ("Travel Time"); and

(3)     $43,582.17 for expenses Plaintiff paid for the father's estate and Sylmac ("Expenses").

(*Id*. ¶¶ 22, 23). On October 31, 2017, during a hearing on various filings in the father's estate before the Anne Arundel County Orphans' Court, Defendant answered "No, definitely not," and "that's just made up," when asked whether he agreed to pay Plaintiff of $40 per hour for time she spent working on the estate. (Hr'g Tr. 62:19–63:2, ECF 86-5 at 2–3).

After the hearing, on December 14, 2017, the Orphans' Court issued an order allowing Plaintiff's claim against her father's estate in the amount of $41,759.74, reducing $1,822.43 from the Expenses to exclude personal travel expenses and meeting time. (ECF 82-4 at 3). However, the Orphans' Court denied Plaintiff's request for Compensation for Service Performed and Travel Time. (*Id*.) Defendant provides a chart summarizing the ruling:

|          | Claimed     | Allowed     | Disallowed  |
|----------|-------------|-------------|-------------|
| Time     | $17,178.00  | 0           | $17,178.00  |
| Travel   | $1,040.00   | 0           | $ 1,040.00  |
| Expenses | $43,582.17  | $41,759.74  | $ 1,822.43  |
| Total    | $61,800.17  | $41,759.74  | $20,040.43  |

(ECF 90 at 8). The Orphans' Court explained:

> It is the opinion of this Court that both parties to this estate, as well as the estate of Sylvia Ross McMillan, have contributed a substantial amount of time and expense over a long period of time as brother and sister to administer the estates of their parents…. With the work performed by both parties, and in recognition of Mr. McMillan and Ms. McCartney being the only heirs in both estates, it is the opinion of this Court that neither party shall be compensated for effort, time, travel, etc. as the remaining assets of the estate shall be split equally after all legitimate expenses of estate administration are paid.

(ECF 82-4 at 3). The Orphans' Court also ordered that Defendant file several amended accounts and a final account within 90 days "so that the remaining residue can be distributed and the estate closed." (*Id.*) Notwithstanding, the father's estate was not closed, and Plaintiff has not received any of the expenses she was awarded from her father's estate. (E. McMillan-McCartney Decl. ¶ 24).

Defendant and his family have lived in the single-family residence on the Homestead Property since the Parents passed away. (*Id.* ¶ 26). On September 20, 1990, an estate appraisal was performed for the father's estate. (ECF 86-6). As to the Homestead Property, the appraisal indicates that "the interior condition of the house is good, with no obvious maintenance required" and that the "exterior is in good condition with no obvious maintenance required." (*Id.*) The appraisal described a separate "two story block foundation and framed apartment/garage combination" on the Homestead Property and opined that this structure was "in average condition, with exterior maintenance such as painting and some shingle repair needed." (*Id.*)

From 1989 to 2002, when Plaintiff and her family visited Maryland from Kentucky, they would stay in the apartment on the second floor of the structure, accessible only via a wooden staircase. (E. McMillan-McCartney Decl. ¶ 26). Plaintiff kept personal property in the apartment and furnished it herself. (*Id.*) There was a lock on the door to the apartment, and both Plaintiff and Defendant had a key. (*Id.*) In or around 2002, Defendant removed Plaintiff's belongings from the apartment and rented it to individuals whom Plaintiff did not know. (*Id.*) The apartment has not been occupied since 2004. (C. McMillan, Jr. Aff. ¶ 16). In or around 2009, Defendant removed the wooden stairs to the apartment for safety reasons. (E. McMillan-McCartney Decl. ¶ 28; C. McMillan, Jr. Aff. ¶ 17 n.1). There was a hole in the roof of the apartment that was repaired in

2011. (C. McMillan, Jr. Aff. ¶ 16). Currently, the structure is in poor condition and is uninhabitable. (*Id.*)

Plaintiff states that Defendant restricted her access to the family home after the passing of their parents. (*Id*. ¶ 27). Her last time inside the family home was in or around August 2018. (*Id.*) In August 2018, Defendant told Plaintiff for the first time that a septic line on the property was broken. (*Id*. ¶ 30). Defendant had never previously indicated to Plaintiff that any major repairs were needed on the property. (*Id.*) In late October 2018, Defendant revealed that the septic issue was more serious than it previously appeared and that it would need to be repaired at significant cost before the Homestead Property could be sold. (*Id.*) Plaintiff suspects that there are other significant problems that Defendant has not informed her of. (*Id.*)

In or around September 21, 2016, Defendant hired a company called Terrain Inc. to petition the Anne Arundel County Office of Zoning and Planning for a density variance that would allow the Homestead Property to be divided into two separate parcels. (E. McMillan-McCartney Decl. ¶ 32). The Defendant proposed subdividing the Homestead Property, Lot 28R, into two lots: Lot 28R-A, consisting of 2.6 acres and containing the family home; and Lot 28R-B, containing 1.7 acres of undeveloped land. (*Id*. ¶ 34). Plaintiff does not agree with the proposed partition because the two hypothetical parcels are not equivalent in size or market value. (*Id*. ¶ 35).

Plaintiff filed this lawsuit on October 28, 2018. Plaintiff subsequently had two sets of appraisals conducted on the Homestead Property, in February 2020 and February 2021. (ECF 86-7; ECF 86-8). The reports reveal various defects, to include damage to well pipes, a non-operational furnace, the need for outbuildings on the property to be demolished due to disrepair, water damage in the basement, settling in the sunroom, and an inoperative radiant baseboard heating system. (*Id.*) Each appraiser also provided comparative values for (1) the Homestead

Property in its entirety; (2) Lot 28R-A; and (3) Lot 28R-B. (*Id*.) The 2020 appraisal estimated the value of the entire Homestead Property to be $439,000, the value of Lot 28R-A to be $323,000, and the value of Lot 28R-B to be $145,000. (*Id*.) The 2021 appraisal puts the market value of the entire Homestead Property at $460,000, and the hypothetical values of Lot 28R-A at $410,000 and Lot 28R-B at $136,000. (*Id*.)

## II.   Procedural History

Plaintiff's Complaint contains eleven counts:

(1)   Count I: Sale in Lieu of Partition, pursuant to Md. Code Ann., Real Prop. § 14-107;

(2)   Count II: Accounting/Sharing of Profits, pursuant to Md. Code Ann., Real Prop. § 14-106;

(3)   Count III: Common Law Sharing of Profits Generated by the Homestead Property;

(4)   Count IV: Common Law Contribution;

(5)   Count V: Common Law Equitable Lien;

(6)   Count VI: Liability for Waste, pursuant to Md. Code Ann., Real Prop. § 14-102;

(7)   Count VII: Breach of Written Contract;

(8)   Count VIII: Breach of Oral Contract;

(9)   Count IX: Unjust Enrichment;

(10)   Count X: Quantum Meruit; and

(11)   Count XI: Ouster.

(ECF 1, "Compl."). Defendant moved to dismiss the Complaint (ECF 22), and then-U.S. Magistrate Judge Stephanie A. Gallagher granted the motion in part, dismissing Counts II and III with prejudice, and denied the motion in all other respects. (ECF 26). Now, Defendant moves for summary judgment as to Counts IV, V, VI, VIII, IX, X and XI (ECF 82), and Plaintiff has filed a cross-motion for partial summary judgment as to Count I (ECF 86).

### III.      Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the non-moving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Sharif v. United Airlines*, *Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

To defeat the motion for summary judgment, "the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is likewise insufficient to overcome a defendant's motion for summary judgment. *Anderson*, 477 U.S. at 252. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id.*

Summary judgment is proper if "a party fails to establish the existence of an element essential to that party's case" or "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Perkins*, 936 F.3d at 205 (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, but the court is not to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249; *see also Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Ordinarily, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

IV.    **Analysis**

    A.  Count I: Sale in Lieu of Partition

In Count I of the Complaint, Plaintiff seeks a court-ordered sale of the Homestead Property and equitable division of the proceeds among the parties. (Compl. at 7–8). Plaintiff argues that she is entitled to summary judgment on Count I because the Homestead Property is not subject to partition in kind without loss or injury to one of the parties. (ECF 86-1 at 39–41). Defendant contests a sale of the Homestead Property in lieu of partition, arguing that an equitable partition of the property may be achieved. (ECF 90 at 18). The Court agrees with Plaintiff and will order sale of the Homestead Property in lieu of partition.

Maryland law provides that "[i]f it appears" that real property "cannot be divided" among the parties interested "without loss or injury" to those parties, "the court may decree its sale" in lieu of partition and "divide the money resulting from the sale among the parties according to their respective rights." Md. Code Ann., Real Prop. § 14-107(a). "[W]hether property shall be partitioned in kind or be sold in lieu of partition, is for the court to determine." *Boyd v. Boyd*, 361 A.2d 146, 149 (Md. 1976). "Such an action is equitable in nature so that the [court] is accorded broad discretionary authority." *Maas v. Lucas*, 349 A.2d 655, 657 (Md. 1975). When making this determination, the question "is not whether there was a 'possibility' that the tract could be partitioned in kind without loss or injury, but whether upon the basis of a preponderance of the evidence it appears that the property could not be divided without loss or injury to the parties interested." *Boyd*, 361 A.2d at 151.

In this case, it appears to the Court by a preponderance of evidence in the record that the Homestead Property cannot be divided without loss or injury to the parties. The results of Defendant's own efforts to partition the Homestead Property support this finding. The Homestead

Property contains one single-family residence, where Defendant and his family have lived since his parents passed away in 1989. (E. McMillan-McCartney Decl. ¶26). With the assistance of a company that he hired in 2016, Defendant developed a proposal to divide the Homestead Property into two parcels that are unequal in size, development, and market value. (*Id*. ¶¶ 32, 34). Two sets of appraisals conducted on the Homestead Property and each of Defendant's proposed post-partition parcels in 2020 and 2021 consistently showed that the value of the larger parcel containing the single-family residence was significantly greater than that of the smaller, undeveloped parcel. (ECF 86-7, 86-8).

Defendant's argument that "the lots could be configured in such a way, whether by size and/or other features, that evens their value" (ECF 90 at 18) is unsupported and, in fact, belied by evidence in the record. It appears from review of the two sets of appraisal reports that, however the Homestead Property is divided, whichever of two resultant parcels contains the single-family residence will have significantly greater value than the one left without it. The 2021 appraisals for both the Homestead Property in its entirety and the larger of Defendant's proposed hypothetical lots indicates a total dwelling value of $205,702 for the single-family house on a replacement cost basis, to include a reduction for depreciation. (*See* ECF 86-8 at 9, 53). According to the 2021 appraisals, the site values of the two hypothetical lots that would result from Defendant's proposed partition are $200,000 for the larger lot and $136,000 for the smaller lot. (*See* ECF 86-8 at 53, 96).[2] All of this indicates that, if the Homestead Property lot were divided into two lots of land of

---

[2] A replacement cost approach to valuation was not utilized in the 2020 appraisals, but even without specific data about the replacement cost of the dwelling, the market approach used in the 2020 appraisals suggests that the single-family house would increase the value of its lot at least approximately $166,000. Using the figures in the 2020 appraisal reports, subtraction of the site value of the Homestead property ($272,000) from the total value ($439,000) results in $167,000 as a value that might be inferred for the dwelling. (*See* ECF 86-7 at 5, 9). Subtracting the site value of the larger hypothetical lot ($157,000) from the total value of that hypothetical lot ($323,000) results in $166,000, as the potential value of the

roughly comparable size, the value of the single-family dwelling by itself would likely exceed the value of either of the two resultant sites. Thus, even if the Homestead Property lot could be divided in way that results in two lots of land with equal value, the lot that is left without the single-family house would likely have a significantly lower value than the lot with the house, which would impose a grave loss or injury to one of the two parties and would be plainly inequitable.

Moreover, the circumstances surrounding this case support a sale of the Homestead Property as an equitable resolution of matters central to the parties' disputes. The parties have been unable to settle their parents' estates for more than 30 years, and their relationship became strained during the process, resulting in this litigation and contested proceedings in the Anne Arundel County Orphans' Court, and making cooperation between the parties an unlikely proposition. The Homestead Property is the last lot remaining of their parents' tract of land. Defendant's efforts to partition the lot, over Plaintiff's objection, has spanned several years. (E. McMillan-McCartney Decl. ¶ 32). Dividing the lot in a way that results in two lots of equal value, even if it were possible in the abstract, may consume several more years. *See Hirshauer v. AQ Holdings, LLC*, No. 1221, 2018 WL 6437671, at *5 (Md. Ct. Spec. App. Dec. 7, 2018) (finding that parties' inability to work cooperatively with one another weighed in favor of sale because partition process would likely be "onerous, expensive, and lead to years of litigation before any finality is obtained"). The need for closure of the estates, combined with the apparently contentious relationship between the parties, weighs in favor of sale in lieu of partition as an equitable and expedient means of separating the parties' interests while minimizing loss of value to either party. Accordingly, Plaintiff's Cross-Motion for Partial Summary Judgment will be granted.

---

dwelling. (*Id.* at 54, 58). In the 2020 appraisal reports, the site values of the two hypothetical lots are listed as $157,000 for the larger lot and $145,000 for the smaller lot. (*Id.* at 58, 102).

B. <u>Count IV: Common Law Contribution & Count V: Common Law Equitable Lien</u>

Counts IV and V concern payments Plaintiff has made in connection with the Homestead Property since 1990, to include payments on a mortgage Defendant obtained and secured by the Homestead Property, and property tax and insurance on the Homestead Property. In Maryland, when "one tenant in common pays a charge or incumbrance upon the common property he is entitled to contribution from his cotenant, and, as against his cotenant, to an equitable lien for the amount due him." *Meyers v. E. End Loan & Sav. Ass'n of Balt. City*, 116 A. 453, 455 (Md. 1922) (citation omitted). In Count IV, Plaintiff seeks a judgment in an amount no less than $376,185 for "one-half of the costs and necessary expenses associated with the [Homestead] Property" Plaintiff has paid since 1990 and the amount Plaintiff has paid on the 1990 mortgage on Defendant's behalf, less any repayments Defendant has made. (Compl. at 10). In Count V, Plaintiff seeks an equitable lien against Defendant's interest in the Homestead Property in the same amount. (Compl. at 11).

Defendant has moved for summary judgment on Counts IV and V. With respect to Count V, Defendant argues that he "never signed anything, said anything, or did anything showing an intent to create a mortgage in Plaintiff's favor." (ECF 82 at 5). Defendant fails to cite any authority for the proposition that he can defeat an equitable lien by any such lack of intent when Plaintiff, his co-tenant, is owed for paying "a charge or incumbrance upon [their] common property[.]" *Meyers*, 116 A. at 455. Therefore, Defendant's motion for summary judgment as to Count V fails.

With respect to Count IV, Defendant argues that the contribution claim is barred by the statute of limitations. (ECF 82 at 4–5). Maryland law[3] establishes a three-year statute of limitations

---

[3] Maryland's statute of limitations applies to this case, as the Court is sitting in diversity. *See Harvard v. Perdue Farms, Inc*., 403 F. Supp. 2d 462, 466 (D. Md. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941)) (explaining that a federal court sitting in diversity must apply the choice of law rules of the forum state); *Doughty v. Prettyman*, 148 A.2d 438, 440 (Md. 1959) (stating that under Maryland choice of law rules, statutes of limitations are matters of procedural law governed by the law of the forum state).

for civil actions, unless another statute provides otherwise. Md. Code Ann., Cts. & Jud. Proc. § 5-101. In her opposition, Plaintiff concedes that she is not entitled to a money judgment for any payment on which she seeks contribution that was made outside the three-year limitations period— that is, prior to October 28, 2015. (ECF 86-1 at 22). In her declaration, however, Plaintiff identifies six property tax and homeowner's insurance payments she made for the Homestead Property on Defendant's behalf, totaling $6,152.41. (E. McMillan-McCartney Decl. ¶ 17). Plaintiff's claim for contribution on these payments are not time barred.

Plaintiff may also recover for payments made prior to October 28, 2015, as incidental relief on Count I because that claim is not subject to a statute of limitations. In *Miller v. Miller*, the Maryland Court of Special Appeals stated, "[i]f the suit is one for partition, the right to which is not barred by limitations, incidental relief by accounting between the parties may be available even as to claims which might be barred if asserted in an independent action." 519 A.2d 1298, 1310 (Md. Ct. Spec. App. 1987) (quoting 20 Am. Jur. 2d, Co-tenancy and Joint Ownership § 105). As Judge Gallagher recognized in ruling on Defendant's motion to dismiss, "[a] party's claim for 'contribution as an offset to the [other party's] claim to one-half of the proceeds of the partition sale' was 'incidental to the partition suit as to which there is no statute of limitations.'" (ECF 25 at 27) (citing *Miller*, 519 A.2d at 1311). Judge Gallagher determined that Plaintiff's contribution and equitable lien claims are "related to her partition action, as they bear on the accounting between the parties in the event of a partition sale." *Id*. at *14. As explained above in Part IV.A, Court will order sale of the Homestead Property in lieu of partition. Plaintiff may be entitled to an adjustment of equities based upon the history of payments made by each party in connection with the Homestead Property, not subject to a statute of limitations.

Defendant's motion with respect to Counts IV and V will be denied.

### C. Count VI: Liability for Waste

In Count VI, Plaintiff seeks a judgment against Defendant in an amount equal to the costs necessary to ameliorate waste of the Homestead Property caused by Defendant and for an injunction to stay the waste. (Compl. at 11–12). The Complaint alleges that "Defendant is liable to Plaintiff for actual damage he caused to the Homestead Property without Plaintiff's express or implied authorization" and "[t]he damage caused by the Defendant has substantially reduced the value of the Homestead Property to the financial detriment of Plaintiff, the co-tenant." (*Id.* ¶¶ 47, 48). Specifically, the Complaint states that an apartment located above a tractor shed on the Homestead Property that was once habitable has been rendered uninhabitable through damage caused by Defendant, to include "severe structural damage" and missing appliances. (*Id.* ¶ 25).

The parties disagree about the scope of Count VI. Defendant argues that this claim is limited to waste to the apartment above the outbuilding on the Homestead Property, while Plaintiff argues that "[t]he language of Count VI is broad and encompasses waste to the entire 'Homestead Property.'" (ECF 82 at 5–6; ECF 86-1 at 24–25). The Court agrees with Defendant that the claim for waste in Count VI, as currently pleaded, is limited to Defendant's liability for any damage he caused to the apartment on the outbuilding.[4]

Factual disputes remain between the parties regarding whether any act or omission by Defendant with respect to the apartment on the outbuilding constitutes waste under Maryland law. In Maryland, waste can occur through a tenant's "act of destruction or devastation" to real property

---

[4] While the language in Count VI is broad enough to encompass any "actual damage [Defendant] caused to the Homestead Property" without Plaintiff's authorization (Compl. ¶ 48), the only such damage alleged in the Complaint is damage to the apartment. The pleading does not place Defendant on "fair notice" of any other grounds upon which Plaintiff's waste claim rests, as required by Fed. R. Civ. P. 8(a)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Both before and after filing the Complaint, Plaintiff learned of certain structural and mechanical defects in the single-family house on the Homestead Property, at least some of which she argues constitutes waste by Defendant (*see* ECF 86-1 at 27–28), but she has not amended her pleading to allege that Defendant caused these damages.

or "failure to exercise the care of a reasonable person to preserve and protect the estate for future interests." *Boucher Inv., L.P. v. Annapolis-W. Ltd. P'ship*, 784 A.2d 39, 49 (Md. Ct. Spec. App. 2001) (citations omitted). "[A] tenant is liable for the actual damage suffered by the property caused when he or she commits waste." *Coutant v. Coutant*, 587 A.2d 1125, 1132 (Md. Ct. Spec. App. 1991) (quoting *Beesley v. Hanish*, 521 A.2d 1235 (Md. Ct. Spec. App. 1987)). "Whether a particular act constitutes waste is generally considered a question of fact for the trier of fact dependent upon condition and usages, character of the premises, and reasonableness of use." *Id.* (citation omitted). Defendant denies that he has done anything, "or failed to do anything, to cause or allow damage, beyond ordinary wear and deterioration, to diminish the value of the property." (C. McMillan Decl. ¶ 17). Defendant does not deny that, as Plaintiff points out, the apartment on the outbuilding was once habitable—and was, in fact, inhabited for extended periods of time in the past—but is no longer habitable and is structurally unsound. (C. McMillan Decl. ¶¶ 13–16; E. McMillan-McCartney Decl. ¶¶ 26–28). Plaintiff attributes the state of the apartment to Defendant's failure to maintain it. (*Id.* ¶ 26). The parties' dispute requires a trier of fact and cannot be resolved on a motion for summary judgment.[5]

Defendant also argues that any claims of waste are barred by the applicable three-year statute of limitations. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. The discovery rule, which applies generally in all civil actions, provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong. *See Hecht v. Resolution Trust Corp.*, 635 A.2d

---

[5] Defendant argues that any diminishment in the value of the apartment does not materially affect the value of the entire Homestead Property because the apartment "could not and cannot be used legally as a residence[.]" (ECF 82 at 6). Plaintiff disputes this proposition. (ECF 86-1 at 10, 25–26). Neither party cites any building codes or expert opinion in support of her or his position. Defendant has made an insufficient showing for summary judgment on this basis. Notably, he does not deny that he rented the apartment out for a period of time in the past and derived value from it. (E. McMillan-McCartney Decl. ¶ 26).

394, 399 (Md. 1994) (citing *Poffenberger v. Risser*, 431 A.2d 677 (Md. 1981)). The rule provides that the limitations period does not begin to run until the plaintiff has notice of a wrong giving rise to a legal claim. Notice is defined as "express cognition or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Id*. at 400 (quoting *Poffenberger*, 431 A.2d at 681). "[M]erely constructive notice" that "rests not on facts but on strictly legal presumptions" is insufficient. *Id*. at 401 (citing *Poffenberger*, 431 A.2d at 681). The date an action accrued is ordinarily "left to judicial determination." *Frederick Road Ltd. P'Ship v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000). That determination "may be based solely on law, solely on fact, or on a combination of law and fact." *Hecht*, 635 A.2d at 399. When findings of fact must be made to identify the date of accrual, "those factual determinations are generally made by the trier of fact and are not decided by the court as a matter of law." *Green v. Pro Football, Inc*., 31 F. Supp. 3d 714, 722 (D. Md. 2014) (citing *Litz v. Maryland Dep't of Env't*, 76 A.2d 1076, 1086 (Md. 2013)).

Here, a factual dispute exists as to when Plaintiff knew or should have known about the waste alleged in Count VI. Defendant states that if he damaged the property in any way to diminish its value, "it was before October 28, 2015, and [Plaintiff] either knew about it or with reasonable diligence could have learned about it prior to that date." (C. McMillan Decl. ¶ 17). Plaintiff states that Defendant rented the apartment on the Homestead Property to someone else in or around 2002, then removed a staircase from the outbuilding in 2009 or 2010 (the only means of accessing the apartment), and never replaced it. (E. McMillan-McCartney Decl. ¶ 26). Thus, since approximately 2002, Plaintiff has been unable to gain access to the apartment to investigate its condition and could not have discovered the nature and extent of the waste committed by Defendant. (*Id.*)

19

Plaintiff also claims that Defendant has placed certain restrictions on her access to the Homestead Property since their parents' passing. (*Id.* ¶ 27). Defendant argues that the missing entryway stairs to the apartment "would put a reasonable person on notice of the apartment's dilapidated condition and that continuing regular maintenance was likely not occurring." (ECF 90 at 5). He further argues that Plaintiff could have used a ladder for inspection purposes, by herself or by hiring a contractor. (*Id.*) Since a factual determination is needed to determine the date of accrual, and genuine disputes remain as to the facts relevant to when Plaintiff knew or should have known about the damage on the Homestead Property, summary judgment is not appropriate.

Accordingly, Defendant's motion with respect to Count VI will be denied.

D.   Count VIII: Breach of Oral Contract

Count VIII concerns Plaintiff's allegation that Defendant breached an oral contract between the parties wherein they agreed "to share expenses associated with Sylmac, Inc. and Defendant agree[d] to pay Plaintiff for services rendered to their father's estate at the rate of $40.00 per hour and reimburse her for expenses." (Compl. ¶ 53). Plaintiff alleges that there are two oral agreements between the parties: (1) one agreement made in 1989 before Defendant's appointment as the personal representative of his father's estate, wherein the parties agreed to share estate expenses equally and Defendant would repay Plaintiff for any payments she made in excess of her share; and (2) another agreement made in 1991 providing for payment to Plaintiff for certain professional services at $40 per hour, plus travel and expenses, all in connection with litigation involving the parties, the estates, estate attorneys, and Sylmac. (E. McMillan-McCartney Decl. ¶¶ 7, 10). Plaintiff alleges that Defendant failed to compensate and reimburse Plaintiff as agreed. (*Id.* ¶¶ 17, 24; Compl. ¶ 55).

Plaintiff seeks from Defendant "an amount no less than $61,800.17, which represents the

amount of money Plaintiff is still owed pursuant to the Parties' oral contract." (*Id.* at 13). Of this amount, $17,178.00 is for work Plaintiff performed for the Parents' estates in connection with estate litigation, at the allegedly agreed upon rate of $40.00 per hour; $1,040.00 is for travel time to attend hearings in Maryland, also in connection with estate litigation; and $43,582.17 is for expenses Plaintiff had advanced on Defendant's behalf for their father's estate and Sylmac. (E. McMillan-McCartney Decl. ¶ 22). Plaintiff filed a claim concerning these expenses against the father's estate in the Orphans' Court for Anne Arundel County. The Orphans' Court allowed Plaintiff's claim against the estate in the amount of $41,759.74 (reducing $1,822.43 from $43,582.17 to exclude personal travel expenses and meeting time) but denied the amount related to work she had performed for the estates ($17,178.00) and costs for travel ($1,040.00). (ECF 82-4 at 3).

Defendant has moved for summary judgment on Count VIII. With respect to the $41,759.74 allowed by the Orphans' Court, Defendant argues that the estate is not yet closed and Plaintiff's claim for payment is not ripe. (ECF 90 at 8). Plaintiff argues that Defendant's failure to close the estate is a component of his breach of the parties' contracts. (ECF 86-1 at 35).

Regarding the remaining amount claimed in Count VIII, Defendant argues that collateral estoppel bars payment and that the statute of frauds applies. The doctrine of "'collateral estoppel' or 'issue preclusion' . . . is a subset of the *res judicata* genre." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d. 322, 326 (4th Cir. 2004). To apply collateral estoppel to an issue or fact, the proponent must demonstrate that: "(1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a

21

full and fair opportunity to litigate the issue or fact in the prior proceeding." *Id*. In ruling on Defendant's motion to dismiss, Judge Gallagher determined that the breach of oral contract claim asserted against Defendant individually in Count VIII is a claim distinct from the claim asserted in the Orphans' Court against the estate of the parties' father. (ECF 25 at 17). The claim made in Count VIII involves issues concerning alleged oral agreements that could not have been resolved in the Orphans' Court, as that court has no jurisdiction to hear or adjudicate the claim. (*Id*.) It follows that Plaintiff did not have a full and fair opportunity to litigate these issues in the Orphans' Court. Therefore, Court VIII is not barred by collateral estoppel.

Defendant further argues that Count VIII is barred by the statute of frauds, citing Section 8-109 of the Maryland Estates and Trusts Code, which provides:

> An action may not be brought to charge a personal representative on any special promise to answer damages out of the personal representative's own estate, unless the contract or agreement on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged, or some other person lawfully authorized by the personal representative.

Md. Code Ann., Est. & Trusts § 8-109(i).

First, it does not appear that § 8-109 applies to the oral agreement allegedly made in 1989 because that contract was purportedly entered before Defendant was appointed personal representative of his father's estate. But even if both oral contracts were made while Defendant was a personal representative, there are disputes of fact relevant to the question of whether the statute of frauds would require the contracts to be in writing.

Second, a Maryland court would likely hold that § 8-109(i) requires that a collateral promise made by personal representative to pay for a debt of the estate to be in writing, but does not require an original promise of the personal representative to be in writing. In *Goldsmith v. Erwin*, the U.S. Court of Appeals for the Fourth Circuit interpreted a North Carolina statute similar

22

in language to § 8-109(i) in light of the well-established distinction between "an original promise, which is not within the statute of frauds, and a superadded one, which is within the statute." 183 F.2d 432, 434 (4th Cir. 1950) (citing *Farmers Federation, Inc. v. Morris*, 27 S.E.2d 80, 81 (N.C. 1943)). This distinction is "equally well settled in Maryland[.]" *Blumenthal v. Heron*, 274 A.2d 636, 639 (Md. 1971). "Every collateral undertaking to answer for the debt, &c. of another is, by the statute of frauds, void, if not in writing; but original undertakings are not within the statute, and need not be in writing." *Elder v. Warfield*, 7 H. & J. 391, 391–92 (Md. 1826). "[I]f the oral promise is made by the promisor to serve some purpose of his own rather than to answer for the debt of another person, the oral promise is not within [the statute of frauds]." *Blumenthal*, 274 A.2d at 639 (citations omitted). Even when an oral promise is "in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability[,]" a promise is not within the statute of frauds when "the main purpose of the promisor is to subserve some pecuniary or business purpose of his own[.]" *Id.* (citing *Elder*, 7 H. & J. 391).

"[T]he test in determining whether an undertaking is collateral or original is whether the promise was in fact made and intended as collateral or as original." *Crown Realty Corp. v. Weinstein et al.*, 9 A.2d 602, 603 (Md. 1939). All of the surrounding circumstances—the situation and interests of the parties, the objects sought to be accomplished, the intent of the parties, their conduct, and the documentary evidence—should be considered. *See id.* ("In deciding [the] question [whether an alleged promise was collateral or original], the situation of the parties and all the surrounding circumstances should be considered."); *Goldsmith*, 183 F.2d at 435 (4th Cir. 1950) ("Whether a promise is an original one not coming within the statute of frauds, or a collateral one required by the statute to be in writing, is to be determined from the circumstances of its making,

the situation of the parties, and the objects sought to be accomplished.") (citation omitted). Generally, when the facts are in dispute, whether a promise is original or collateral is a question for the trier of fact. *Crown Realty Corp. v. Weinstein et al.*, 9 A.2d 602, 603–04; *see also Goldsmith*, 183 F.2d at 435; 9 Williston on Contracts § 22:6 (4th ed.).

Here, the question is whether, in entering the oral agreements alleged in Count VIII, the parties intended for Defendant's promise to compensate Plaintiff (1) to answer for the debt of their father's estate or (2) to serve Defendant's own purpose. If the former was intended, then the undertaking was collateral and required to be in writing by the statute of frauds; but if the latter was intended, then the promise was original and not required to be in writing. Defendant argues that the oral agreements are collateral pointing to (1) Plaintiff's statement that the parties agreed that Plaintiff would be entitled to payment for her services, plus travel and expenses, and "that this would be an expense of the estates, which . . . [Defendant] agreed to personally repay"; and (2) the fact that Plaintiff petitioned to have the money paid from the father's estate in the Orphans' Court as "reimbursement and expenses for compensation for services rendered to the estate." (ECF 90 at 12). Plaintiff argues that the debt resulting from the oral contracts is not an existing debt of her father, the decedent, but "arises from Defendant's personal promise to pay Plaintiff for services rendered to him, to assist him with fulfilling his obligations as personal representative." (ECF 86-1 at 34). Plaintiff also points out that the expenses and services for which Defendant promised to pay her were not only for their father's estate but were also for Sylmac. (*Id.*) A reasonable trier of fact, considering the circumstances under which the oral agreements were made could conclude that they were original and made to serve Defendant's own purposes, rather than to answer for any debt of his father's estate. For this reason, Defendant's motion with respect to Count VIII will be denied.

E. Count IX: Unjust Enrichment

In Count IX, Plaintiff seeks to recover her payments toward the 1990 mortgage secured by the Homestead Property and Defendant's share of the property taxes, insurance, and other expenses as tenants in common which Defendant failed to pay.

Unjust enrichment, a "quasi-contract" cause of action, is a remedy to provide relief for a plaintiff when an enforceable contract does not exist, but fairness dictates that the plaintiff receive compensation for benefits provided. *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998). A claim for unjust enrichment is not available when "the subject matter of the claim is covered by an express contract between the parties." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000) (quoting *FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998)); *see also Froelich v. Erickson*, 96 F. Supp. 2d 507, 524 (D. Md. 2000), *aff'd sub nom. Froelich v. Senior Campus Living, LLC*, 5 F. App'x 287 (4th Cir. 2001). Without any genuine dispute that the parties entered into a written agreement in 1993 concerning amounts Plaintiff loaned to Defendant to pay the 1990 mortgage (ECF 86-4), an unjust enrichment claim to recover these amounts is not available to Plaintiff. The Court will grant Defendant's motion for summary judgment as to this portion of Plaintiff's unjust enrichment claim.

However, the parties dispute whether they made an agreement regarding the property taxes, insurance, and other expenses Plaintiff has paid on Defendant's behalf since 1990. As explained in Part IV.D above, Plaintiff claims that, in 1989, before Defendant became the personal representative of his father's estate, the parties orally "agreed that [they] would be responsible for an equal share of the estate expenses[,] [a]nd to the extent [Plaintiff] paid more than [her] share, [Defendant] personally agreed to repay [Plaintiff] from his inheritance when the final distributions were made from the estates." (E. McMillan-McCartney Decl. ¶ 7). Defendant has denied making

this oral agreement. (C. McMillan Decl. ¶ 8). If no such express agreement was made, Plaintiff may seek recovery of payments made for Defendant's benefit under an unjust enrichment theory.

Defendant argues that a claim for any alleged enrichment occurring before October 28, 2015, is barred by the three-year statute of limitations. Under Maryland law, unjust enrichment claims, like an action on contract, are subject to a three-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. § 5–101; *see also Llanten v. Cedar Ridge Counseling Ctrs., LLC*, 5 A.3d 1030, 1034 (Md. Ct. Spec. App. 2013) (holding that because an unjust enrichment claim is analogous to the legal remedies of breach of contract and conversion, § 5–101 provides the statute of limitations). Nonetheless, "[i]n Maryland, unlike most other states, an acknowledgment of a subsisting debt, unaccompanied by any qualification or declaration which, if true, would exempt a defendant from a moral obligation to pay, or such an acknowledgment accompanied by a refusal to pay, coupled with an excuse for not paying which itself furnishes no real objection to the payment of the debt, is sufficient to remove the bar of the statute [of limitations]." *Doughty v. Bayne*, 160 A.2d 609, 611 (Md. 1960); *see also McMahan v. Dorchester Fertilizer Co.*, 40 A.2d 313, 314 (Md. 1944) ("[e]ven a mere acknowledgment of such a debt will remove the bar of the statute, because if the debtor acknowledges the debt it is implied that he promises to pay"). Such an acknowledgment "must be a clear, distinct, and unqualified admission." *Am. Shelter*, 2009 WL 10685275, at *3 (citing *Doughty*, 160 A.2d at 611). Partial payment of a debt can be considered an acknowledgment. *Id.* (citing *McMahan*, 40 A.2d at 314).

Here, genuine issues of material fact remain as to whether Defendant has acknowledged a debt to Plaintiff for payments she made toward Defendant's share of the property taxes, insurance, and other expenses for the Homestead Property. Plaintiff states that Defendant made "payments to [her] towards the outstanding balance of property taxes and homeowner's insurance [she had] paid

on [Defendant's] behalf since 1990." (E. McMillan-McCartney Decl. ¶ 17). She lists six payments, totaling $6,152.41, that she made on Defendant's behalf for property taxes and insurance between 2016 and 2018, and three payments that Defendant made to her, totaling over $3,200, in 2016, 2017 and 2018. (*Id*.) However, Defendant states that the only payments he has made to Plaintiff "on any claims she has asserted against [him]" were for payments Plaintiff made toward the 1990 mortgage. (C. McMillan Decl. ¶ 9). Defendant states that he has "made payments on [his] own obligations for the Homestead and at times paid more than [his] share of repairs, maintenance, and improvements." (Id.) Thus, the parties appear to dispute whether any payments Defendant made between 2016 and 2018 were partial payments of a debt he owes to Plaintiff for homeowner's insurance and property taxes. If Defendant indeed repaid Plaintiff for insurance and tax payments she had made on Defendant's behalf, such repayments could be considered an acknowledgment of the debt Plaintiff alleges, which would remove the bar of the statute of limitations for her unjust enrichment claim. Nothing in the record would exempt Defendant from a moral obligation to repay Plaintiff for any payments she made toward Defendant's share of property taxes, insurance, and other expenses for the Homestead Property.

Because genuine disputes of fact remain that bear on whether the parties had an agreement covering these expenses and whether the statute of limitations is a bar to Plaintiff's recovery on a theory of unjust enrichment, summary judgment is not appropriate. Defendant's motion will be denied as to the portion of Plaintiff's unjust enrichment claim concerning the property taxes, insurance, and other expenses for the Homestead Property. However, Defendant's motion will be granted as to the portion of Plaintiff's unjust enrichment claim that concerns payments Plaintiff made toward the 1990 mortgage because a written contract covers the parties' rights and obligations as to these payments.

F.   Count X: Quantum Meruit

In Count X, Plaintiff seeks to recover the reasonable value, *quantum meruit*, of services she provided for Defendant's benefit with the intention of being compensated. "[Q]uantum meruit was the common law count or form of action which allowed recovery where the plaintiff had performed services for the defendant[.]" *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 843 A.2d 252, 292 (Md. Ct. Spec. App. 2004) (quoting *Murdock–Bryant Construction v. Pearson*, 703 P.2d 1197, 1201–02 (Ariz. 1985)). A claim for *quantum meruit* may be based upon either of two theories of recovery: (1) contract implied-in-fact, or (2) contract implied in law, i.e. quasi-contract. The plaintiff could recover "on a theory of implied-in-fact contract" for services "provided at the defendant's request[.]" *Id.* (quoting *Murdock–Bryant Construction*, 703 P.2d at 1201–02). A *quantum meruit* claim based on an implied-in-fact contract theory permits the plaintiff to recover "the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Id.* (quoting *Mogavero v. Silverstein*, 790 A.2d 43, 54 (Md. Ct. Spec. App. 2002)). "The recovery allowed for services which had not been requested by defendant was based upon quasi-contract, and theoretically had as its central core the principle against unjust enrichment." *Id*. Use of the term *quantum meruit* "in these two very different senses has, not surprisingly, been a source of confusion." *Id*.

Defendant has moved for summary judgment on the *quantum meruit* claim, arguing that if Plaintiff proceeds on the alleged oral agreement where Defendant promised to personally pay her for the services then she cannot recover based upon a quasi-contract theory. "It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Cnty.*

*Comm'rs of Caroline Cnty.*, 747 A.2d at 607 (quoting *FLF, Inc.*, 999 F.Supp. at 642). Thus, if, as alleged in the Complaint, the parties entered into an oral agreement concerning the services at issue in Count X, then recovery on Count X is not available to Plaintiff. But this is not an adequate basis for summary judgment because, as explained below, genuine disputes remain regarding whether the alleged oral contract ever existed. Count X provides an alternative means for Plaintiff to recover the value of the alleged services if no express contract is found to have governed the parties' rights and obligations with respect to those services.

Defendant argues that Plaintiff's *quantum meruit* claim is time barred because the last date she provided services for which she now sues for payment was more than three years prior to the filing of this action. Claims for *quantum meruit*, unjust enrichment, and breach of contract are all subject to a three-year statute of limitations under Md. Code Ann., Cts. & Jud. Proc. § 5-101. *Am. Shelter*, 2009 WL 10685275, at *3 (citing *Cargill v. Brady*, 190 A.2d 793, 794 (Md. 1963)); *Shailendra Kumar, P.A. v. Dhanda*, 43 A.3d 1029, 1033–34 (Md. 2012). "In breach of contract cases, a cause of action typically accrues at the time of the breach." *Id.* at 1035. A breach occurs when a party "fail[s] without legal excuse to perform any promise which forms the whole or part of a contract, and may be inferred from the 'refusal of a party to recognize the existence of a contract, or the doing of something inconsistent with its existence.'" *Duncan Servs., Inc. v. ExxonMobil Oil Corp.*, 722 F. Supp. 2d 640, 647 (D. Md. 2010) (quoting *Weiss v. Sheet Metal Fabricators, Inc.*, 110 A.2d 671, 675 (Md. 1955). Maryland courts have held that, in the absence of an express or an implied-in-fact contract, which may stipulate payment on a later date, a claim for services on a quasi-contract theory normally accrues on the date services are rendered. *See Dempsey v. McNabb*, 21 A. 378, 379 (Md. 1891); *Mayor & Council of Federalsburg v. Allied Contractors, Inc.*, 338 A.2d 275, 280 (Md. 1975); *Willox v. Ladas*, Civ. No. CCB-13-2096, 2014

WL 4662049, at *4 (D. Md. Sept. 18, 2014) (citing *Dempsey*); *Dolan v. McQuaide*, 2016 WL 7235627, at *3 (Md. Ct. Spec. App. Dec. 14, 2016) (unpub.).

Here, the last date Plaintiff rendered services for which she claims payment in Count X was in August 2014 (ECF 82-3 at 15), more than three years prior to the filing of this suit on October 28, 2018. Plaintiff states in her declaration, however, that Defendant agreed orally in 1991 to compensate her for her services from his share of their inheritance on a later date: after final distributions were made from the estates. (E. McMillan-McCartney Decl. ¶ 10). Defendant denied having made this agreement while testifying at a hearing before the Orphans' Court of Anne Arundel County on October 31, 2017 (ECF 86-5 at 2–3), and, since that date, has failed or refused to close his father's estate and repay Plaintiff as agreed, (E. McMillan-McCartney Decl. ¶¶ 19, 21, 24), all of which, Plaintiff contends, constitutes a breach of their agreement. The alleged breach, therefore, post-dates October 28, 2015, according to Plaintiff. If Plaintiff is correct, then her claim for the value of her services, whether based upon an express or implied-in-fact contract, is not time barred. As noted, however, Defendant denies that he ever made an agreement to compensate Plaintiff for her services at $40 per hour. If Defendant is correct, then any claim for services based upon a quasi-contract theory would have accrued no later than the last date those services were rendered, which was in 2014, and therefore any such claim would be time barred.

The parties' dispute of facts material to whether the alleged agreement was made cannot be resolved on summary judgment. With a view of the facts in the light most favorable to Plaintiff, the Court cannot find as a matter of law that her *quantum meruit* claim is time barred and therefore denies summary judgment as to Count X.[6]

---

[6] Defendant also argues that this claim "is barred by collateral estoppel just the same as the oral contract claim" (Count VIII). (ECF 82 at 9). Defendant's argument is unavailing for the same reasons provided in Part IV.D above.

G.  Ouster Count XI: Ouster

In Count XI, Plaintiff seeks to recover the fair rental value of the apartment on the Homestead Property for the period during which she was allegedly ousted from the property. Under Maryland law, tenants in common are jointly seized of the entire estate, and each has an equal right of entry and possession; the possession of one is the possession of all. *Susquehanna Transmission Co. of Md. v. St. Clair*, 77 A. 1119, 1120–21 (Md. 1910). In the context of co-tenancy, ouster is "a notorious and unequivocal act by which one cotenant deprives another of the right to the common and equal possession and enjoyment of the property." *Young v. Young*, 376 A.2d 1151, 1158 (Md. Ct. Spec. App. 1977). Ousting must be an overt act that is a hostile invasion of another's rights. *White v. Pines Cmty. Improvement Ass'n, Inc.*, 939 A.2d 165, 178 (Md. 2008). "And while the ouster need not have been accompanied by positive force, it must have been actual, and be established by acts or declarations brought home to the knowledge of the cotenant." *Id*. "[A]ny act or conduct signifying his intention to hold, occupy and enjoy the premises exclusively, and of which the tenant out of possession has knowledge, or of which he has sufficient information to put him upon inquiry, amounts to an ouster" of the out-of-possession co-tenant. *Id*. However, ouster will not be presumed from exclusive possession by one co-tenant; actual ouster must be proved. *Israel v. Israel*, 30 Md. 120, 122–23 (1869). For example, "an exclusive possession by [one co-tenant], accompanied by a receipt of the whole rents and profits, with a claim of title to the whole property . . . was a clear ouster of his cotenants." *Hogan v. McMahon*, 80 A. 695, 697 (Md. 1911). Other relevant factors, combined with exclusive possession of the property, may establish ouster, such as hostility toward co-tenants when they trying to visit the property, changing locks while failing to give co-tenants a key, and removing co-tenants' names from an insurance policy. *See e.g.*, *Nelson v. Nelson*, 917 N.W.2d 479, 486 (N.D. 2018). "The question of ouster is

31

not one of law, but of fact for the jury." *Van Bibber v. Frazier*, 17 Md. 436, 447 (1861).

Here, Plaintiff argues that, because Defendant and his family have occupied the main dwelling house since their father passed away, she could not freely use it. She could not use the apartment because (1) Defendant removed her belongings from the apartment and rented it out to others in or around 2002, and (2) Defendant removed a wooden staircase that was the only means of access to the apartment, in 2009. (E. McMillan-McCartney Decl. ¶¶ 26, 28). Defendant denied that he ever ousted Plaintiff and claims that the wooden stairs were removed for safety reasons. (C. McMillan Decl. ¶¶ 3 n.1, 20). The factual dispute between the parties precludes summary judgment.

Defendant argues that Plaintiff's claim is time barred, as any allegations of ouster occurred before 2015. Plaintiff argues that the ouster continued through the three-year limitations period preceding the filing of this lawsuit because the apartment was in an uninhabitable condition and lacked any point of access during that time period. (ECF 86-1 at 33). As discussed above, the issue of when a cause of action accrued is a question of law for the court; however, disputed facts upon which the issue is to be determined are for the jury. *See Frederick Road Ltd. P'Ship*, 756 A.2d at 973; *Hecht*, 635 A.2d at 399; *Poffenberger*, 431 A.2d 677. Determining when Plaintiff's ouster claim accrued requires examination of the nature of Defendant's conduct, Plaintiff's knowledge of such conduct, and whether and when Plaintiff had sufficient information to put her upon inquiry notice of ouster. Such factual determinations are for the trier of fact and cannot be decided on summary judgment. *Green*, 31 F. Supp. 3d at 722 ("[F]actual determinations [as to the date of accrual] are generally made by the trier of fact and are not decided by the court as a matter of law."). Therefore, summary judgment on Plaintiff's ouster claim is not appropriate, and Defendant's motion with respect to Count XI is denied.

## V.      <u>Conclusion</u>

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF 82) will be granted in part and denied in part, and Plaintiff's Cross-Motion for Partial Summary Judgment (ECF 86) will be granted. Specifically, Defendant's motion will be granted as to the portion of Plaintiff's claim for unjust enrichment in Count IX that is based upon Plaintiff's payments toward the 1990 mortgage. Defendant's motion will be denied in all other respects.

A separate Order follows.

September 30, 2022                              /S/
Date                                                   Matthew J. Maddox
                                                         United States Magistrate Judge